## SALAN LONNIE COY WILSON *v.* STATE OF MARYLAND

[No. 375, September Term, 1968.]

*Decided May 13, 1969.*

42

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Joseph E. Emerson* for appellant.

*H. Edgar Lentz, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City*, and *Edward F. Seibert, Assistant State's Attorney for Baltimore City*, on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The only question presented on this appeal is whether the evidence was sufficient to sustain the conviction of the appellant, who was found guilty of being a rogue and vagabond at a court trial in the Criminal Court of Baltimore on 2 October 1968 and sentenced to one year consecutive to a sentence he was then serving. The question is to be resolved under Md. Rule 1086, by the provisions of which this Court will not set aside the judgment of the lower court on the evidence unless clearly erroneous, giving due regard to the opportunity of the lower court to judge the credibility of the witnesses. In the Memorandum on Motion for Reargument in *Edwards v. State,* 198 Md. 132, the Court of Appeals noted that it was asked by counsel how it could ever say that the trial court was clearly wrong. It said, at 159:

> "This question can only be answered as and when it is presented, case by case. If we recognize the difference between the roles of triers of facts and appellate courts, and the terms of Rule 7 (containing, as then in effect, the substance of present Md. Rule 1086), it is to be expected that such cases will be rare * * *." See *Williams v. State,* 5 Md. App. 450, 452-460.

This is one of those rare cases and we find that the judgment of the lower court on the evidence was clearly erroneous.

The appellant and Samuel Stuart Simms were jointly indicted but tried separately.[1] The indictment contained one count, charging that on 20 June 1968 they "* * * were rogues and vagabonds in violation of Article 27, Section 490 of the annotated code of Maryland * * *."[2]

---

1. Samuel Stuart Simms was convicted at a court trial on 5 September 1968 and sentenced to 18 months. He noted an appeal but thereafter dismissed it on 20 November 1968.

2. The count followed the language in Md. Code, Art. 27, § 491 which states that it shall be sufficient to use a formula substantially to that effect in any indictment for rogues and vagabonds as defined in § 490.

44

Marie Marsiglia testified that she resided at 2624 St. Paul Street, Normandy Apartments, 1-A. She went to get her mail about 11:30 a.m. on 20 June 1968 and "noticed that there were two young boys or men in the hall"—hallway on the first floor. "And I went back in again (into her apartment) and I come out a few seconds more and I noticed the boys going down the mailboxes at the names." They were running their finger down looking at the names. "So then I looked to go to get the manager and, as I am going down the hall, I meet Miss Crue and I tell her. With that the two young men come down the hall and we asked them what they were looking for and they said, '4-B.' They had some painting to do. I went to get the manager and Miss Crue (a neighbor and tenant in the apartment house) wouldn't allow them up the steps. * * *. She held them off and wouldn't allow them up the steps. So they set in the chairs in the hall where they were seated. They stayed there for about five or ten minutes. With that they left. With that the manager came up and saw them going down the steps, going out the door. They were really raising a rumpus because we had stopped them. And that's all." She made a positive in-court identification of the appellant as one of the boys she saw in the hallway. When she first saw him he had a magazine in his hand but nothing else. On cross-examination she said they were dressed in street clothes and that Miss Crue stopped them from going up the stairs by, spreading her arms "out the side of the stairway." They did not attempt to go by her. Mrs. Marsiglia had lived in the apartment house a year and a half and had never seen the boys before. She did not know whether or not anyone was home in apartment 4-B that day.

Lorraine Crue testified she had lived in the apartment house a little over a year on the first floor about two-thirds of the way down the hall, approximately 25 feet from the mailboxes which were located right inside the front door. She came out of her apartment and "saw these two boys just fooling around the mailboxes and Mrs. Marsiglia was standing near my door. She said:

"She said she was scared; she saw those two boys fooling around there. So I had a pan of wash to take in the yard and I walked up and I stood and watched them. And then I said, 'Well, I am not going to leave you alone.' And I took the pan of wash and set it on the first landing. There's a landing there goes down and the other stairway goes up. It's a walkup apartment. And the place where the chairs are is right opposite the stairways. There's two chairs there, one on the other side of the hall. I stood there and watched them and took the pan down and set it on the first landing. And we were standing there and these two boys came sprinting down the hall and made the turn. They were going to turn and go up the stairway. And I was right where the stair comes up from the landing and it's quite narrow, and I put one hand on the newel post and the other one on the wall just like that (indicating) nonchalantly. And we asked these boys where they were going and they insisted they were going up to do a job. They were insisting on going up to do the work upstairs, and we knew there was no work to be done up there. Then we asked them who they wanted to see. They said two different names. Each one of them spoke up a different name and they mumbled over it and it was hard to understand. * * *. Well, they insisted on—each one of them was saying a different name and mumbling it over and not saying the names correctly, and then they started on this Greek name. They flung themselves down in the chair and spread out like that (indicating) and insisted on going to see this family with the Greek name, and they insisted, and they knew he was home, and so on like that. * * *. Well, they kept insisting and insisting on going up to see him and we said he wasn't home. * * *."

She identified the appellant as one of the boys. She recognized "the Greek name" as a tenant in the apartment house.. "I know the people by sight and I know the names because the names are already on the mailboxes and on the doorbell." She did not know whether or not the man whose name they gave was at home. After the boys sat down she went out of the building to a side entrance and got the janitor. When she and the janitor came back the boys were going out the door. "They were just starting across 27th Street and St. Paul when we got there and saw them." On cross-examination she described "sprinting down the hall" as "walking rapidly * * * just walking quickly." The name they gave was "Kapakas, or something like that * * *. They didn't know how to pronounce it; didn't know how to spell it * * * a name like that is hard to pronounce anyway." They insisted they were at the apartment house "to see this party about a job * * *. They insisted on going up to see him." The transcript shows the following questions by the court and answers by the witness:

"THE COURT: You said they changed their story. Was that about seeing this Greek gentleman in reference to employment?

THE WITNESS: No, no, they wanted to go upstairs to do work first. And then, when we said there wasn't work to do, then they changed their story to wanting to go up and each one of them said a different name and they weren't pronouncing the names correctly. And then they flung themselves down in the chair.

THE COURT: You said they wanted to see this man about a job?

THE WITNESS: Yes.

THE COURT: Was that different from doing work in the apartment?

THE WITNESS: Yes, yes, because Mr. Dawson does the work in the apartments, the painting and any kind of work like that."

On further cross-examination by defense counsel the witness said that when she first saw the boys, they said they were going upstairs to do work. "Then they insisted on going upstairs to do painting and we knew there wasn't any work like that up there." After they sat down they said "They wanted to see this Greek man, they insisted on seeing him about some work. He was supposed to get some work for them. They said he wasn't employed; he was upstairs."

Edward Dawson, the janitor, identified the appellant as one of the boys he saw going out the door. He saw a police officer coming down the street and told the officer what had happened. The officer was Earl Mathias and the apartment house was on his regular beat. He was cruising south on St. Paul Street in the 2700 block and "observed two boys walking north on St. Paul. They were acting sort of suspicious and in the rear pocket of one I noticed a brown paper bag." He saw Mr. Dawson on the corner waving, talked to him, then went "east on 27th Street and north on Calvert, got to 29th Street, went west on 29th Street, and at the corner of 29th and Charles there's a high-rise apartment. I observed these same two boys about to enter the rear of this high-rise apartment." He identified the appellant as one of the boys. "As I approached these two boys, they stepped back over the chain and sat on the chain." He explained this and related his further actions as follows:

"There was a chain over the entrance to this high-rise apartment. And I got out and I talked to the boys for a few minutes and I asked them to accompany me—if they would accompany me to the Northern District to talk to the Sergeant. They agreed. I took them in my car to the Northern District. The Sergeant was talking to them. And I went back to 2624 and got the full information as to what happened there."

When he went back to the station house he was informed that the boys were under arrest, each charged

with being a rogue and vagabond. The brown paper bag was in the pocket of the appellant's companion, Simms, and "the end of a screwdriver was sticking out of it." The appellant had nothing in his hands except a magazine. On cross-examination it was adduced that the chain at the high-rise apartment was across a driveway leading to a courtyard. The building had a rear doorway "near there." "They had just put one leg over the chain" when the officer approached. "They came back and sat on the chain."

Motion for judgment of acquittal at the close of the evidence offered by the State was made and denied. The appellant then testified. He said he went with Simms to the apartment at 2624 St. Paul Street. Simms was going to see a friend about a job. Simms looked at the mailboxes, found his friend's name and said he was in apartment 4-B. He said Simms explained this to Mrs. Marsiglia. He had met Simms at 25th and Charles Streets earlier. "He told me he was going to see a friend of his about a job, making $3.25 an hour painting. I was going to start back to work the following morning, Yale and Fishpaw, 11 North Gilmore, where I previously worked, and all I was making there was $2.00 an hour." When they left the apartment house he was going to 29th Street and Maryland Avenue to where a friend, Freddy Perry, usually parked his car and Simms was going to go home on a No. 10 bus. He did not see Perry's car "so we waited around for a little bit." Simms "was getting ready to leave and I was going to wait for Freddy Perry's car. * * *. I was sitting on the chain, swinging like." Simms was standing there. The officer did not get out of the car; he motioned for them to come over and they started talking. He did not know that Simms had a screwdriver. He had been working for Yale and Fishpaw, painters and decorators on Gilmore Street, from the time he was released in 1967 from Cheltenham Farm but had not worked for two weeks. The man Simms was looking for was a personal friend of Simm's father and although the man did not work—"he was retired

or something, I don't know"—Simms was going to talk to him about getting a job. Simm's referred to the man as John and once as "Kalowski or something. I don't remember, I can't pronounce it." The appellant had a prior record of being a rogue and vagabond, procuring, possession of a barbiturate, and several disorderly conduct convictions. He offered no other evidence. Asked by the court if he wanted Simms in court to testify he said, "I don't know what he could say for me. All he could say, you know, that I didn't have the screwdriver on me. Like I said, I didn't know he had a screwdriver on him." He said in answer to a specific question by the court, that he had no witness he desired to testify for him.

We said in *Thomas v. State,* 1 Md. App. 528, 532 that Md. Code, Art. 27, § 490 has three distinct parts, by the commission of any one of which a person shall be deemed a rogue and vagabond:

1) If he shall be apprehended possessed of tools or implements at places and under circumstances from which a felonious intent to break and enter a dwelling or storehouse may be presumed;

2) If he shall be apprehended possessed of offensive weapons at places and circumstances from which may be presumed an intent feloniously to assault any person;

3) If he shall be found in or upon any dwelling house, warehouse, stable or outhouse, or in any enclosed yard or garden or area belonging to any house, with an intent to steal any goods or chattels.

In *Crossland v. State,* 252 Md. 70, 73 the Court of Appeals said, "The language of Section 490 indicates that it is an essential element of the statutory crime that the accused have the intent *to commit* a crime." It appears that as to parts (1) and (2) the possession of the tools, implements or weapons at the appropriate places and in the appropriate circumstances leads to a presump-

tion that the possessor had the intent to commit the specified crime. This presumption is, of course, rebuttable, but the possessor is then called upon to rebut it by a credible explanation, much as he is called upon to explain the exclusive possession of recently stolen articles to overcome the inference that he was the thief. See *Boswell and Poe v. State,* 5 Md. App. 571, 576-579. As to part (3), however, there is no reference to a presumption. To be deemed a rogue and vagabond under that part a person must be found in or upon the specified area "with an intent to steal any goods or chattels." The act of going in or upon the proscribed areas is made criminal only if done with a specific intent—to commit larceny, grand or petit. This specific intent is a necessary element of the crime and the burden is upon the State to prove it. Therefore the intent must be alleged and proved according to the terms of the statute. See *Baker v. State,* 6 Md. App. 148.[3] The intent to steal cannot be presumed or inferred from the *mere* presence of a person in or upon the proscribed areas or implied as a matter of law; it must be proved as a matter of fact. See *Ramsey v. State,* 5 Md. App. 563, 570. This is not to say that the intent may not be inferred from the circumstances under which a person is found in or upon the proscribed areas. *Jason v. State,* 1 Md. App. 136. But the evidence must show directly or support a rational inference from which the trier of fact could be fairly convinced, beyond a reasonable doubt, that the person was there with an intent to steal goods or chattels. *Williams v. State,* 5 Md. App. 450.

It is clear that the lower court here based the conviction on part (3) of the statute and we agree that this was the applicable part. The court found that the appellant was in the hallway of 2624 St. Paul Street (The Normandy Apartments) and in the enclosed area of the apartment building at 29th and Charles Street (The Dell

3. The intent required by § 490 is sufficiently alleged by the formula set forth in § 491 as it incorporates § 490 by reference.

House).[4] It characterized the presence of the appellant at each of these places as "unexplained." It said:

> "That establishes a pattern. And going on the property of others where they have, in my opinion no right to be, no legitimate business. From that pattern, I think, it can be clearly and very logically determined that they were there with the intention of taking goods of others. So the intention * * * to steal the goods or chattels, and as such, Mr. Wilson, you would be a rogue and vagabond."

As we interpret these remarks it was the "unexplained" presence of the appellant at both of the apartments which led the court to infer that the intent of the appellant was to steal goods or chattels. We do not believe that the evidence as to the presence of the appellant at Dell House, standing alone, was sufficient to show a specific intent to steal at the Dell House, nor do we think, in the circumstances, that it had such substantial probative value as to supply the specific intent of the appellant to steal at the Normandy Apartments, if such intent could not be properly inferred from the circumstances surrounding the appellant's presence at the Normandy Apartments. The question is, therefore, whether the evidence pertaining to the presence of the appellant at the Normandy Apartments showed directly or supported a rational inference that he was there with an intent to steal any goods or chattels. The court said, "You don't go to an apartment house midday looking for a job as a painter, plus the fact I believe the two witnesses who said you first said you wanted to go to this apartment to do painting. I think you have changed your testimony and I think that the testimony you offered here today has

---

4. As to the latter the court found as a fact that "these men had crossed over this chain and when the officer came up, they retraced their steps and sat on the chain. And under these circumstances, they would have been in the enclosure of the rear of the Dell House at Charles and 29th Street."

been contradicted and it is totally unsupported, is illogical, and I think all of the logical inferences to be drawn from the testimony in this case are that you were within the enclosures of these properties with the intention of stealing." In reaching his conclusion the court emphasized that it was particularly anxious to see whether or not "you wanted the gentleman in apartment 4-B to appear as a witness." It said:

> "The gentleman in 4-B would testify that he didn't know you or Mr. Simms and that he wasn't in the business of getting painter's jobs and your failure to produce him leaves me with the conclusion that he would not have testified as you have indicated."

The burden of proving the specific intent to steal was on the State. It did not offer the testimony of "the gentleman in 4-B" and the court could not supply, to the extent that it apparently did, the testimony of the witness who did not testify, in arriving at its verdict. As was stated in *Hayette v. State,* 199 Md. 140, 145: "Ordinarily disbelieving evidence is not the same thing as finding evidence to the contrary." Neither Mrs. Marsiglia nor Miss Crue knew whether or not the occupant of apartment 4-B was at home when the appellant was in the apartment building and there was no evidence that he was not at home, whether or not he knew Simms and whether or not he was to obtain him a job or employ him to do painting,[5] Of course, the general rule is that the trier of fact is under no obligation to believe

5. On the hearing for a motion for a new trial, which is not before us, and which had no bearing on the verdict at the trial on the merits, defense counsel said that he had ascertained that the occupant of apartment 4-B was George M. Poulakis. He said that Mr. Poulakis told him he was unable to identify either Simms or Wilson. He proffered that Simms would testify that he was not sure which apartment he was going to. "All he knows is that he was going to see a Mr. Kapikis." There was an Emanuel Kapikis listed on the apartment mailbox. Simms' attorney did not want Simms to testify because there was an appeal pending. The motion for a new trial was denied.

the explanations or denials of the defendant, the weight of the evidence and the credibility of the witnesses being matters for it. *Nichols v. State,* 5 Md. App. 340; *Hutchinson v. State,* 1 Md. App. 362. Although the credibility of the appellant's explanation could have been better established by the testimony of the occupant of apartment 4-B we cannot say that the court was clearly wrong on the evidence before it in finding that the appellant's presence was not credibly explained. Thus the ultimate question is whether the "unexplained" presence of the appellant in the light of all surrounding circumstances supported the inference that he was in the apartment building with an intent to steal any goods or chattels.

It is because of the infinite variety of factual situations that the clearly erroneous rule must be applied case by case. We can look to cases previously decided only for general guidelines. As to the rogue and vagabond statute the instant case lies between those in this State in which the judgments have been affirmed and those in which the judgment has been reversed on the question of the sufficiency of the evidence, for the factual situation does not lead to as clear a conclusion as it did in the cases previously decided. The following cases serve as examples of those in which the judgment was affirmed. In *Jason v. State, supra,* where the defendant's explanation of his presence in an apartment building at 1:45 a. m. was implausible—that he was seeking employment from someone whose name he did not recall—there was also evidence that he was tampering with an apartment door. In *Woodell v. State,* 2 Md. App. 433, the defendants were found beneath a bedroom window at 1:30 a. m. about six feet from a door. One said to the other, "Jimmy the s.o.b." They were apprehended by the police about 50 to 75 yards from the door and fresh jimmy marks were found on the door and the doorjamb had been pried away. In *Allen v. State,* 2 Md. App. 740, the defendant was seen about 12:15 a. m. going up a fire escape. He had a shiny object in his hand and "was

working on the back door. * * *. It looked like he was trying to pry the rear door open. * * *." In *Farley v. State*, 3 Md. App. 584, bars in a drugstore window had been pried apart and the police saw a large screwdriver fall to the ground; the defendant was found about 3 feet from the screwdriver and about 10 feet from the drugstore. In *McGhee v. State*, 4 Md. App. 256, there was evidence from which the court, sitting as a jury, found that Davis, a companion of the defendant, was about to break into a dwelling when he was observed, that Davis had a typical burglar tool upon him when apprehended, with Davis and in the back yard. In *Day v. State*, 2 Md. App. 404, we reversed the judgment, holding that there was no rational inference supported by the evidence that the defendant had been on the porch of the dwelling the defendant was in an apartment house about 1:25 a. m. with intent to steal, but there his explanation for being on the premises was uncontradicted and not found to be implausible.

In the instant case there was no direct evidence establishing an intent to steal. There was no evidence of tampering with an apartment door and no evidence sufficient to show that the appellant was attempting to break into the mailboxes. It may well be that the appellant was in the apartment for some nefarious purpose. But considering the place where he was found—a hallway accessible to the public on the first floor of the apartment building; the time of day—shortly before noon; his activities while in the hallway; the absence of flight or attempted flight upon being first observed; and his subsequent activities, we cannot say, in light of the provisions of the applicable part of § 490, that the evidence supported a rational inference of a specific intent to steal goods or chattels from which the court could fairly be convinced beyond a reasonable doubt of the appellant's guilt of being a rogue and vagabond. The conjectures of the lower court may have been entirely correct, but no matter how suspicious the circumstances, a conviction without sufficient proof cannot be sustained under the

laws of this State. A person is innocent until he is proved guilty and there must be evidence which leads to such a result. *Spencer v. State,* 1 Md. App. 264.

*Judgment reversed; case remanded for a new trial.*