859 A.2d 1084

Franklin Roosevelt DABNEY

v.

STATE of Maryland.

No. 1611, Sept. Term, 2003.

Court of Special Appeals of Maryland.

Oct. 4, 2004.

226

Eve L. Brensike (Nancy S. Forster, Public Defender, on the brief), Baltimore, for Appellant.

Diane Keller (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Panel: HOLLANDER, SHARER and CHARLES E. MOYLAN, Jr., (retired, specially assigned), JJ.

CHARLES E. MOYLAN, Jr., Judge (Retired, Specially Assigned).

The Baltimore County Police Department, after an obviously carefully prepared post-midnight surveillance of the appellant from the far northwestern corner of Baltimore County to its far southeastern corner—a surveillance involving six or seven unmarked police cars, a police helicopter, and the use of a highly sophisticated thermal imaging tracking device—ended up charging the appellant with attempted fourth-degree burglary. Attempted fourth-degree burglary? It smacks of convicting Al Capone, after Elliot Ness had been on his trail for a decade, of income tax evasion. It is perfectly legal, of course, but there remains the lingering aftertaste of overkill.

The appellant, Franklin Roosevelt Dabney, was convicted by a Baltimore County jury of attempted burglary in the fourth degree. In this appeal, he raises the three contentions

1. that he was convicted of a non-existent crime, to wit, an attempt to commit an attempt;

2. that the evidence was not legally sufficient to support the conviction; and

3. that the trial judge committed plain error in instructing the jury on the subject of a criminal attempt.

We need make no more than a passing observation or two about the second and third contentions. With respect to the appellant's invitation to us to invoke the "plain error" exemption from the preservation requirement, the appellant has given us no glimmer of a reason as to why we would wish to set a criminal free on a non-preserved technicality when we do not have to do it. Even if, *arguendo,* an error occurred that contributed to the appellant's conviction (we are not suggesting that it did), there is no due process problem for, when an objection is unpreserved, no process is due. As to how an appellate court might choose to react when a possible error is, by random chance, left unpreserved, we are not unsympathetic to Chief Justice Joseph Weintraub of New Jersey in *State v. McKnight,* 52 N.J. 35, 243 A.2d 240, 250 (1968), when he observed:

> The Constitution is not at all offended when a guilty man stubs his toe. On the contrary, it is decent to hope that he will.

See *Ciriago v. State,* 57 Md.App. 563, 576, 471 A.2d 320 (1984). And see *Morris v. State,* 153 Md.App. 480, 506–24, 837 A.2d 248 (2003); *Perry v. State,* 150 Md.App. 403, 434–40, 822 A.2d 434 (2002); *Jeffries v. State,* 113 Md.App. 322, 325–26, 688 A.2d 16 (1997); *Austin v. State,* 90 Md.App. 254, 257–59, 260–72, 600 A.2d 1142 (1992).

As to evidentiary sufficiency, the evidence was overwhelming that the appellant, on the early morning of January 20, 2003, in a residential area of White Marsh, was up to no good—of one sort or another. That much was certain. From the abundant indications of ominous, albeit undifferentiated, skulduggery, moreover, there could arguably arise, *inter alia,* the permitted inference that he was out to steal something.

The evidence was marginal, but it was probably enough if we were to assume a cognizable offense.

In the last analysis, however, it is unnecessary to address these two contentions formally because of our ultimate agreement with the appellant's first contention.

## An Improbable Odyssey

At approximately midnight on the evening of January 19–20, 2003, the appellant left his apartment in northwestern Baltimore County, got into his black Infiniti, and drove out of his neighborhood. For reasons unexplained to us in this record, a police surveillance team, consisting of six or seven unmarked police cars, was on station, waiting to monitor the appellant's every move. They monitored him as he stopped at a service station and purchased gasoline. As the appellant then approached the Reisterstown Road entrance to the Baltimore Beltway (I–695) and turned east on it toward Towson, a police helicopter joined the surveillance.

Detective Jeffrey Collins observed that the appellant's driving was "normal" while on the Baltimore Beltway. Detective Steven Inge observed that the appellant was driving "very slow." On his way around the Beltway, the appellant first took the Dulaney Valley Road exit and detoured through a residential neighborhood just off Dulaney Valley Road. Apparently finding nothing to his liking, he returned to the Beltway and, still attended by his police escort, resumed his journey east and south. Without a single traffic infraction, the appellant followed the Beltway to the southeastern corner of the county, where he left the Beltway and proceeded into a residential neighborhood in White Marsh.

As the appellant entered the residential area, the police cruisers dropped off from close surveillance and set up a perimeter blockade around the neighborhood. The helicopter, however, continued the surveillance from an altitude of 3,000 feet. Officer Patrick Connolly, of the Police Department's Aviation Section, conducted that surveillance with a thermal imaging camcorder, a device that registers and records the

heat emitted from persons or objects in order to trace their movements. When viewed through the thermal imaging camcorder, persons or objects that emit heat will appear white, whereas objects that do not emit heat will appear as black or gray. The appellant's car, for instance, appeared as white because of the heat emitted by its motor.

Using the thermal imaging camcorder, Officer Connolly described the appellant's behavior once inside the residential neighborhood: "[He] just did a lot of driving around all of these little side streets." Using a map, Officer Connolly narrated for the jury the route of the appellant's vehicle.

"It came in Deviation, up Ballygar, drove around. Here's Santa Rita. It did a lot of just driving around in this area. It came down Santa Rita to Ballygar, back around, went up Kilbride. He turned around, came back down Kilbride, turned onto Ballygar. And he parked, approximately, right here."

Officer Connolly observed the appellant park his car on Ballygar Road, around the corner from the home of Vendel and Patricia Ann Katona, who lived on the perpendicular Kilbride Road. When the appellant alighted from his vehicle, he walked up Ballygar Road to its intersection with Kilbride. He turned right on Kilbride and walked to the Katona home, which is the second house in from the intersection.

Mr. and Mrs. Katona did not know the appellant, had neither met him nor heard of him, and did not give him permission to enter onto their property. The light was on in the Katona living room. Mrs. Katona was still up, reading and watching television, although Mr. Katona had gone to bed at around 11:30. Two cars were parked in the Katonas' front driveway.

Officer Connolly, from the helicopter, observed the appellant walk up that driveway, pause for about ten seconds between the two parked cars, walk back down the driveway to the street, and then cross the lawn to the front porch of the house. After standing on the porch for a short time, the appellant walked around the side of the house and then to the rear of the house.

At that point, Detective Molly Gardner, in one of the unmarked surveillance vehicles, drove slowly down Kilbride Road and stopped almost in the front of the Katonas' home. The appellant, apparently "alerting" to the vehicle, ran behind the Katona home, behind the neighboring home, and back to his car on Ballygar Road. Officer Connolly described in detail the appellant's movements from the time he left his car until the time he returned to it.

He exited the vehicle, came up onto the sidewalk here, walked down the sidewalk toward Kilbride Road, made a right-hand turn on Kilbride, came down Kilbride. There's a house here on the corner. It was the second house that was actually facing Kilbride, this one right here (indicating). He walks down the sidewalk, goes right down the driveway of this house, spends maybe 10 seconds or so just standing next to the vehicles here in the driveway; then goes between the vehicles, walks back around, comes out to the sidewalk, actually steps out into the street here on Kilbride. Then, he cuts right down across the front lawn of the house and goes up on the porch of the house.

He was there for several seconds. We see him come down off the porch, walk down around the side of the house, come down along the side of the house and almost go to the rear of the house right here. He then comes back around from the rear of the house and he's coming up along the side of the house. Then, a car comes down the street, pulls up and stops, approximately, in front of the house that he was at. He then runs down behind the house, runs down behind the neighbor's house here, goes down here to the house at the corner and is hiding behind the house here at the corner.

He stays here, approximately, maybe 20 seconds or so. Then, he runs straight from this house back to his car. And then from our vantage point, there's like a big row of trees or bushes here. We see him from this house, going toward his car. Approximately, five seconds or so goes by, and then we see the vehicle leave. We see this vehicle drive out from behind the tree line here and drive down the road.

The appellant drove immediately away from the White Marsh neighborhood. He was not stopped by the police. Indeed, he was not arrested until a month later, at which time he was charged with, *inter alia*, attempted fourth degree burglary. The thermal imaging tape was played for the jury. The appellant did not testify. The odyssey was never explained.

## A Dubious Charge

The appellant was not convicted of a consummated fourth-degree burglary, but only of an attempted fourth-degree burglary. "Ay, there's the rub."

Of the various forms of criminal behavior covered by the umbrella crime of fourth-degree burglary, the attempted subvariety for which the appellant was primarily, if not exclusively, tried was a type of criminal behavior that had earlier been one of the two ways in which an accused could be found guilty of being a rogue and vagabond. Maryland Code, Criminal Law Article, § 6–205(c) provides, in pertinent part:

A person, with the intent to commit theft, may not be in or on ... a yard, garden, or other area belonging to the dwelling ... of another.

Assuming for the moment the sufficiency of the evidence to support a reasonable inference of "the intent to commit theft," the appellant in this case was clearly guilty of a consummated fourth-degree burglary of that particular subvariety and not of a mere attempt. As the case was ready to go to the jury, the prosecutor was aware of a looming problem as he addressed the court.

We have to address the verdict sheet, because *it's not attempted burglary in the fourth degree, it's burglary in the fourth degree*—he was on that property with the intent to steal.

(Emphasis supplied).

The court reminded the prosecutor of the obvious and prominent impediment to correcting the verdict sheet. The appellant had never been charged with a consummated fourth-degree burglary and consequently could not be convicted of it.

The verdict sheet, in a word, could not be corrected. The prosecutor responded, "the State's argument regarding that would be that he attempted to have an intent to commit a theft," whatever that may mean. There may be a subtlety there beyond our comprehension, but we have no idea what it may be. The court subsequently instructed the jury on the law of attempt and on fourth-degree burglary of the rogue and vagabond subvariety. The jury returned a verdict of guilty of attempted fourth-degree burglary.

The problem is not that proof of consummation would not also support a conviction for the attempt, because the attempted crime is, as a matter of logical necessity, a lesser included crime within the consummated crime. Some attempts fail and others succeed, but they are attempts in either event. The attempt simply lacks one element possessed by the consummated crime, and it has no independent element of its own. *Lightfoot v. State*, 278 Md. 231, 360 A.2d 426 (1976). The problem is that an attempt to commit this particular predicate crime (a fourth-degree burglary of the rogue and vagabond subvariety) may carry in its genes a different but innate impediment all of its own, and thereon hangs the tale that follows.

### The Common Law Misdemeanor of Attempt

In assessing the compatibility of a marriage between 1) an inchoate attempt and 2) the predicate crime attempted, the necessary analysis, by definition, is doubled. In *Lane v. State*, 348 Md. 272, 284, 703 A.2d 180 (1997), Judge Wilner referred to how the nature of the symbiotic relationship changes with the varying characteristics of the predicate crime attempted:

[A]ttempt "is an adjunct crime; it cannot exist by itself, but only in connection with another crime;" and it thus "expands and contracts and is redefined commensurately with the substantive offense."

We will look first at the common law misdemeanor of attempt itself. In *Gray v. State*, 43 Md.App. 238, 239, 403 A.2d 853 (1979), this Court traced the early development of the common law misdemeanor.

The notion that an attempt to commit a crime—any crime, felony or misdemeanor, statutory or common law, preexisting or of later origin—is itself a crime came relatively late into Anglo–American jurisprudence. It had its origins in the Court of Star Chamber, during Tudor and early Stuart times.[1] Its crystallization into its present form, however, is generally traced to the case of *Rex v. Scofield,* Cald. 397, in 1784. The court held in *Rex v. Scofield,* "The intent may make an act, innocent in itself, criminal; nor is the completion of an act, criminal in itself, necessary to constitute criminality." The doctrine was locked into its modern mold by 1801 with the case of *Rex v. Higgins,* 2 East 5. Relying on *Scofield,* the court in *Higgins* confirmed a conviction, saying, "All offenses of a public nature, that is, all such acts or attempts as tend to the prejudice of the community, are indictable." In the wake of *Scofield* and *Higgins,* it was clear that an attempt to commit any felony or misdemeanor, of common law origin or created by statute, was itself a misdemeanor.

---

[1] See generally Sayre, *Criminal Attempts,* 41 Harv. L. Rev. 821 (1928), and Hall, *General Principles of Criminal Law,* 558–74 (2nd Ed. 1960).

We turned then to the firm implantation of attempt law into the soil of Maryland.

It is, furthermore, clear that the common law misdemeanor of criminal attempt, notwithstanding its post-Revolutionary final crystallization, has always been recognized as part of the common law of Maryland. Hochheimer, *Crimes and Criminal Procedure* (2nd Ed. 1904), p. 297–298; *Franczkowski v. State,* 239 Md. 126, 127, 210 A.2d 504 (1965); *Wiley v. State,* 237 Md. 560, 563–564, 207 A.2d 478 (1965); *Lightfoot v. State,* 278 Md. 231, 360 A.2d 426 (1976); *Lightfoot v. State,* 25 Md.App. 148, 334 A.2d 152 (1975); *Fisher v. State,* 1 Md.App. 505, 231 A.2d 720 (1967).

43 Md.App. at 239–40, 403 A.2d 853.

■ From the beginning, it has been indisputably established that the common law misdemeanor consists of two

elements: 1) the *mens rea* of intending to commit a particular crime and 2) the *actus reus* of taking a substantial step, beyond mere preparation, toward the commission of the targeted crime. In *Grill v. State*, 337 Md. 91, 94, 651 A.2d 856 (1995), Chief Judge Murphy spoke for the Court of Appeals:

A person is guilty of a criminal attempt when, with intent to commit a crime, the person engages in conduct which constitutes a substantial step toward the commission of that crime whether or not his intention is accomplished.

See also *Lane v. State*, 348 Md. 272, 284, 703 A.2d 180 (1997); *State v. Earp*, 319 Md. 156, 162–63, 571 A.2d 1227 (1990); *Townes v. State*, 314 Md. 71, 75, 548 A.2d 832 (1988); *Cox v. State*, 311 Md. 326, 329–31, 534 A.2d 1333 (1988).

### Burglary in the Fourth Degree

Before turning to the symbiosis in this case between the venerable common law misdemeanor of attempt and the far younger statutory misdemeanor of burglary in the fourth degree, it behooves us to lay the newer and less familiar specimen out on the table for at least a cursory examination. Fourth-degree burglary is an umbrella statute, embracing no less than four subvarieties of now criminal behavior. *Herd v. State*, 125 Md.App. 77, 83, 724 A.2d 693 (1999). What is true of some of those subvarieties, moreover, is not true of others. The first two, for instance, are mere general intent crimes, whereas the latter two are specific intent crimes. The first two are recent statutory inventions, whereas the latter two were already venerable at the time of Blackstone and Hale. It is a miscellaneous collection, with its common denominator or organizing principle being that the various offenses share, if nothing else, the same level of appropriate punishment of being "subject to imprisonment not exceeding 3 years." § 6–205(e).

Although recodified in 2002 as Criminal Law Article, § 6–205, the crime of burglary in the fourth degree (by that formal name at least) was first made a part of the criminal law of Maryland by Chapter 712, § 2, of the Acts of 1994 and was

initially codified as Article 27, § 32.[1] In its current form, Criminal Law Article, § 6–205 lists four subvarieties of prohibited behavior.

(a) *Prohibited—Breaking and entering dwelling.*—A person may not break and enter the dwelling of another.

(b) *Same—Breaking and entering storehouse.*—A person may not break and enter the storehouse of another.

(c) *Same—Being in or on dwelling, storehouse, or environs.*—A person, with the intent to commit theft, may not be in or on:

(1) the dwelling or storehouse of another; or

(2) a yard, garden, or other area belonging to the dwelling or storehouse of another.

(d) *Same—Possession of burglar's tool.*—A person may not possess a burglar's tool with the intent to use or allow the use of the burglar's tool in the commission of a violation of this subtitle.

The four crimes grouped under the umbrella of fourth-degree burglary neatly divide into two sets of two crimes each. The first set, subvarieties (a) and (b), focus on the *actus reus* of breaking and entering a dwelling or a storehouse, with only the minimal *mens rea* of a general intent.[2] By contrast, subvarieties (c) and (d) are far less

---

1. The creation of the crime of burglary in the fourth degree by the Legislature in 1994 was part of a general revision of the burglary laws. What are now subvarieties (a) and (b), the breaking and entering offenses, had formerly been separate crimes as Art. 27, § 31A and § 31B. What are now subvarieties (c) and (d) had formerly constituted the independent rogue and vagabond statute, Art. 27, § 490.

2. One tactical advantage enjoyed by fourth-degree burglary of subvarieties (a) or (b) is that whereas voluntary intoxication can be an effective defense against more aggravated degrees of burglary, requiring a specific intent, it can be no defense against these subvarieties of fourth-degree burglary.

Even as general intent crimes, however, both *Warfield v. State*, 315 Md. 474, 493, 554 A.2d 1238 (1989), and *Green v. State*, 119 Md.App. 547, 705 A.2d 133 (1998), make it clear that subvarieties (a) and (b) are not *mala prohibita* or strict liability offenses and that the defendant

demanding as to the *actus reus*. They do not require the breaking and entering of a structure. They do demand, however, the enhanced *mens rea* of a specific intent, either "to commit theft" under (c) or to commit "any violation of this subheading" under (d).

## A. The Breaking and Entering Statutes

■ Subvarieties (a) and (b) of fourth-degree burglary were relatively recent statutory additions to the matrix of laws covering burglary and other forms of breaking and entering.[3] They proscribe, respectively, the breaking and entering of 1) "the dwelling of another" and 2) "the storehouse of another." They do not require proof of any specific intent to commit any crime inside the dwelling or the storehouse of another. What *Herd v. State, supra,* said about what is now § 6–205(a) is equally true about § 6–205(b).

> *The most prominent characteristic of the mens rea of that variety of fourth-degree burglary dealt with by § [6–205(a)] is that it creates a mere general-intent and not a specific-intent crime.* That conclusion inexorably follows from looking at the four corners of the statute itself. *Section [6–205(a)] expressly prohibits the breaking and entering of the dwelling of another and makes no mention of any specific*

---

must know that the invasion or trespass is unauthorized. As Judge Hollander pointed out in *Green*, 119 Md.App. at 558–59, 705 A.2d 133:

> The entry upon the property of another is the focus, even if the actor does not intend to do any other act once upon the property. Consequently, the offense does not require a specific intent. There must, however, be a wrongful intent to enter the property itself, which is what the Court characterized as a general intent to enter the property.

**3.** In *Warfield v. State, supra,* Judge Orth described the proliferation of burglary laws:

> The lacunas in common law burglary prompted the enactment from time to time of a hodgepodge of statutes. We now have in Maryland, in addition to common law burglary, crimes of statutory burglary and crimes of statutory breaking.

And see Moylan, "The Historical Intertwining of Maryland's Burglary and Larceny Laws or the Singular Adventure of the Misunderstood Indictment Clerk," 4 U. Balt. L. Rev. 29 (1974).

*intent that must accompany the breaking and/or entering.* As in the case of any statutory crime, a special mental element, particularly a specific intent, would have to be expressly spelled out. None has been.

125 Md.App. at 85, 724 A.2d 693 (emphasis supplied).

*Herd* went on to explain the hierarchical relationship between burglary in the first degree, burglary in the third degree, and subvariety (a) of burglary in the fourth degree, all of which are designed to protect dwellings.

*Each of those three escalated criminal proscriptions prohibits the breaking and entering of the dwelling of another. The actus reus of all three crimes is exactly the same. The only differences are in the mens rea.* The differences among the three offenses involve only the existence of a particular specific intent or the absence of any such specific intent. [Burglary in the first degree] involves the specific intent to commit theft or a crime of violence in the burglarized dwelling. When that specific intent is present, the crime is a felony with a maximum term of imprisonment of twenty years. [Burglary in the third degree], the next step down on the ladder of blameworthiness, involves the lesser required specific intent to commit any crime in the burglarized dwelling. When such lesser specific intent is present, the crime is still a felony but is subject to a maximum term of imprisonment of only ten years. [Burglary in the fourth degree (a)], the final step down on the ladder of blameworthiness, does not require a specific intent to commit a crime of any sort in the burglarized dwelling or to do anything else for that matter. For that reason, the offense is only a misdemeanor subject to a maximum term of imprisonment of but three years. *The absence of a specific intent is the only thing that distinguishes [fourth-degree burglary] from [third-degree burglary].* Without that distinction, the legislative scheme would be an absurdity.

125 Md.App. at 85–86, 724 A.2d 693 (emphasis supplied).

In *Bane v. State,* 73 Md.App. 135, 147–52, 533 A.2d 309 (1987), Judge Bloom referred to fourth-degree burglary of this

subvariety as a "late starter in the burglary field" and explained that the motivation for the new law, enacted by ch. 661 of the Acts of 1973, was the desire of the State's Attorneys of Maryland to have a lesser crime on which they could tactically fall back in instances in which they could readily prove the *actus reus* of breaking and entering but encountered difficulties of proof when it came to the *mens rea* of a particular specific intent.

> In 1973, the Maryland Senate Judicial Proceedings Committee received testimony from the State's Attorneys of various counties and Baltimore City that *there was a need for a burglary offense of less severity than common law burglary or any of the then applicable statutory burglary-type crimes. The existence of such an offense,* it was argued, *would facilitate prosecutors in the handling of cases in which the felonious intent, a required element of common law burglary and all of the then statutory burglary offenses, of the intruder could not be clearly shown.* Senate Bill 218 was drafted and submitted to the 1973 General Session with the intent of creating a criminal offense to comply with the State's Attorneys' wishes.

73 Md.App. at 148, 533 A.2d 309 (emphasis supplied). *Bane* was very specific about the limited nature of the intent requirement.

> Since *misdemeanor breaking and entering* involves no felonious or larcenous intent, it *is a crime of general intent* that includes within its scope a variety of acts, including some that are reckless or negligent. A conviction for that offense may result either from a well-planned scheme—or merely rash, impetuous conduct of a defendant.

*Id.* at 150, 533 A.2d 309 (emphasis supplied). See also *Hawkins v. State,* 291 Md. 688, 694, 436 A.2d 900 (1981).

In *Warfield v. State, supra,* Judge Orth pointed out that, following the lead of the General Assembly's creation of a general breaking and entering misdemeanor for dwellings in 1973, which became Art. 27, § 31A, the General Assembly provided the same protection for storehouses and other struc-

tures by ch. 598 of the Acts of 1979. What then became Art. 27, § 31B has now become subvariety (b) of fourth-degree burglary, indistinguishable from subvariety (a), except for the nature of the structure broken and entered. Judge Orth described the creative process and the new crime:

> All that we have said about § 31A with respect to intent applies with equal force to § 31B. Section 31B was designed to fill the gap in § 31A by going beyond a dwelling house and including a bevy of structures.
>
> The similarity of the language of the two statutes and their legislative history clearly show that § 31B, like § 31A, does not embrace a specific intent but does require a general criminal intent to break and enter.
>
> Sections 31A and 31B of Article 27 create the misdemeanors of criminal trespass.

315 Md. at 497–98, 554 A.2d 1238.

## B. Rogues and Vagabonds

Whereas subvarieties (a) and (b) of fourth-degree burglary are of recent vintage (dating from 1973 and 1979, respectively), subvarieties (c) and (d) enjoy an ancient lineage. Interesting insight into the common law's attitude toward rogues and vagabonds may be gleaned from Part IV (Of Public Wrongs) of Sir William Blackstone's *Commentaries on the Law of England* (Robert Malcolm Kerr edition, 1962), first published in 1765. In Chapter XIII, Blackstone deals generally with what he calls "Offences against public police." Aimed at persons of disreputable status or character, his introduction to the category is enlightening.

> The last species of offences which especially affect the commonwealth, are those against the public *police* and *economy.* By the public police and economy I mean the due regulation and domestic order of the kingdom; whereby *the individuals of the state, like members of a well-governed family, are bound to conform their general behaviour to the rules of propriety, good neighbourhood, and good manners; and to be decent, industrious, and inoffensive* in their respective stations. This head of offences must therefore

be very miscellaneous, as it comprises all such crimes as especially affect public society, and are not comprehended under any of the four preceding species.

*Id.* at 162 (emphasis supplied).

Turning to more particularized instances of disreputable behavior, Blackstone first touches upon 1) clandestine marriages, 2) bigamy, and 3) common nuisances. He then turns to "Idleness, vagrants, and disorderly persons," with the introductory observation that "idleness in any person whatsoever is also a high offense against the public economy." *Id.* at 169. After treating the cases of 1) Gypsies and 2) other idle and disorderly persons (including prostitutes, rope dancers, and mountebanks), Blackstone turns his focus on rogues and vagabonds. Of the thirteen categories of rogues and vagabonds that he describes, it is category 10 and category 11 that eventually made it to Maryland.

10. Persons having in their custody any pick-lock, key, crow, jack, bit, or other implement, with intent feloniously to break into any dwelling-house, warehouse, or out-building, or armed with any gun, pistol, cutlass, bludgeon, or other offensive weapon; or having upon them any instrument, with intent to commit any felonious act.

11. Persons being found in or upon any dwelling-house, warehouse, or out-house, or in any enclosed yard, garden, or area, for any unlawful purpose.

*Id.* at 169.

Although the criminal proscription against roguery and vagabondage may have made it to Maryland much earlier as part of the general common law, it received formal legislative recognition as part of the first codification of the Maryland criminal law by ch. 138 of the Acts of 1809. With only the inconsequential change of a word here or there, the 1809 statute, in § VII(4), was indistinguishable from the Blackstonian version, with one exception. For those found "in or upon any dwelling house, warehouse, stable or outhouse or in any yard or garden," Blackstone further required a finding of "for any unlawful purpose," whereas the Maryland version was

confined to being "with an intent to steal any goods or chattels." As Judge Orth pointed out for this Court in *Downes v. State*, 11 Md.App. 443, 445 n. 1, 274 A.2d 663 (1971):

[F]rom 1809 to date [it] has had only one change of substance and that was by ch. 467, Acts 1878, which provided that the intent may be presumed from the place and circumstance of the apprehension.

In the decades prior to the promulgation of the crime of fourth-degree burglary in 1994, the rogue and vagabond law was codified as Art. 27, § 490. It was most thoroughly analyzed in *Downes v. State, supra; Holtman v. State*, 12 Md.App. 168, 171–73, 278 A.2d 82 (1971); *Wilson v. State*, 7 Md.App. 41, 49–55, 253 A.2d 439 (1969); *Thomas v. State*, 1 Md.App. 528, 532–34, 231 A.2d 915 (1967).

## "The Road Not Taken"

Of the four subvarieties of fourth-degree burglary, only two of them, on the facts of this case, might arguably have qualified as the predicate or target crime for the attempt that was charged. Subvariety (b) was inapplicable because no "storehouse" was involved. Subvariety (d) was inapplicable because no "burglar's tool" was involved. On these facts, the predicate crime attempted, assuming the sufficiency of the proof of intent, might have been subvariety (a), the breaking and entering of the dwelling of the Katonas. It might also have been subvariety (c), being in the yard or other area belonging to the dwelling of the Katonas with the intent to commit a theft. It might easily have been both.

Both subvarieties were covered by the general charging document authorized by Criminal Law Article, § 6–210. Subsection (b) of that section further provides that, if "the general form of indictment or information" is "used to charge a crime under this subtitle," the defendant, "on timely demand, is entitled to a bill of particulars." In this case, the appellant never requested particulars and both forms of the possible predicate crime remained viable as the trial progressed. The sufficiency of the evidence to support either version of the

attempt, moreover, was essentially indistinguishable, for an intent to commit a theft under the circumstances of this case was tantamount to an intent to break and enter. Whatever the intent of the appellant may have been, he was not creeping around the yard of the Katona home at one o'clock in the morning with the intent to steal lawn furniture. The proofs of the two intents would, in this case, rise or fall together.

It appears to us that the overall strategy of the prosecution was not carefully planned. This is ironic in view of the massive investigative effort that had preceded it. If subvariety (c) of fourth-degree burglary was going to be relied upon, the appellant should have been charged with a consummated fourth-degree burglary, and not merely with an attempt. If in doubt, the State could easily have charged him with both in alternative counts.

If, on the other hand, the State was only going to push an attempt rather than a consummated crime, an attempted subvariety (a) would have avoided the problem, yet to be discussed, inherent in an attempted subvariety (c). The State could easily have pursued both strategies on parallel tracks. For whatever reason, it did not.

We are by no means certain, with respect to the contention that the appellant was convicted of a non-existent crime, that, with a charging document broad enough to include subvariety (a) as the predicate crime attempted and with the proof sufficient to support such a conviction, the appellant could not be held to have been convicted of an attempted subvariety (a), even though none of the participants in the trial seemed to have been aware of that theoretical possibility. Such a conviction would have been of an existent crime. It is by no means certain that such an argument could prevail, but it is also by no means certain that it could not.

In this case, however, we are not inclined, *nostra sponte*, to undertake what could be a Herculean analysis of first impression. In neither opening statement nor closing argument, by either party, was the possibility of relying on subvariety (a) of fourth-degree burglary even mentioned. At trial, no theory of

guilt based on subvariety (a) was ever advanced. The jury instructions requested and the jury instructions given made reference only to subvariety (c), the rogue and vagabond variety of fourth-degree burglary. It is clear that, although an alternative and better theory of guilt might have been hovering in the air waiting to be exploited, the prosecuting attorney, the defense attorney, the judge, the appellant, and the jurors looked upon this case as an attempt to commit subvariety (c) of fourth-degree burglary and as nothing else.

Even in brief and argument before this Court, a possible alternative theory based on subvariety (a) has not been advanced. Under those circumstances, we are content to go with the flow. The conviction, therefore, will be reviewed in terms of its being for an attempt to commit a fourth-degree burglary of the rogue and vagabond variety. Can there be such an attempt?

### Was This a Cognizable Attempt?

The appellant's contention is that his conviction for attempted fourth-degree burglary of the rogue and vagabond variety amounted to a conviction for an "attempted attempt," and that there is no such crime. There is, to be sure, a nebulous and spectral notion, floating out there somewhere in the ether, that may support the appellant's contention. The problem is that it is a notion that has, to the best of our knowledge, never been explored or examined in any sort of depth and that has never been precisely or consistently articulated. Its utility to the appellant will depend on how that still nebulous notion materializes.

■ The most common statement of the notion is that there is no such crime as an attempted assault. When that statement is more carefully limited so as to apply only to assaults of the attempted battery variety, it is unquestionably correct. *Lamb v. State*, 93 Md.App. 422, 458–59, 613 A.2d 402 (1992). Sometimes, however, the statement of the ill-defined proposition is broadened into one that there is no such crime as an attempted attempt. Sometimes it is yet further broadened to

state that there is no such crime as an attempt to commit a crime that is itself in the nature of an attempt. Sometimes it is even further broadened to say that there is no such crime as an attempt to commit an inchoate crime. Sometimes, sadly, these four very different propositions are used with random and careless interchangeability. We have looked in vain, in both caselaw and academic literature, for a meaningful analysis.

### A. Statement No. 1: "There Is No Such Crime as an Attempted Assault"

The proposition that there is no such crime as an attempted assault is deeply entrenched and is virtually hornbook law. In *Christensen v. State,* 33 Md.App. 635, 643, 365 A.2d 562 (1976), this Court held:

> *There is no such crime as an attempt to commit an assault* .... Indeed, assault is an attempt.... Patently, then, the third count in part asseverated a non-existing crime, *i.e.,* an attempt to commit an assault or, reduced to its actually meaning, an attempt to attempt.

(Emphasis supplied).

That statement, adequate for the case at hand, was much too broad. In *Lamb v. State, supra,* 93 Md.App. at 458–59, 613 A.2d 402, we more carefully narrowed the proposition.

> May there be an attempted assault? The answer is obviously both "no" and "yes." *There may not,* of course, *be an attempted assault of the attempted-battery variety. That type of assault is already inchoate and there may not be an attempted attempt.*

Where the assault, on the other hand, is of the intent-to-frighten variety, there is no reason whatsoever why there cannot be an attempt to commit it. One attempts to put a victim in reasonable apprehension of an imminent battery, but, for some reason, the victim (unconscious, blind, deaf) fails to apprehend the danger. The assault that was contemplated was not of an inchoate crime but of a fully consummated crime. It, therefore, like any other crime

may be attempted as long as the normal prerequisites of attempt law are satisfied. It would not be an attempted attempt, which is the only thing that gave rise to the old cliche in the first place.

(Emphasis supplied).

Rollin Perkins and Ronald Boyce, *Criminal Law* 168 (3d ed. 1982), agreed that the proposition had to be narrowed to one variety of assault.

> "From what has been said, it is apparent that reference may be made to an 'attempt to assault' without logical absurdity. There is nothing absurd in referring to an attempt to frighten, which would constitute, if successful, a criminal assault in most jurisdictions."

*See* Annotation, "Attempt to Commit Assault as Criminal Offenses," 93 A.L.R.5th 683 (2004). Although the annotation lists some states as holding that there is no crime of attempted assault and other states as holding that there is, the only controversy between the two camps reduces itself to the question of how broad the definition is of the underlying assault, the very problem that this Court explained and resolved in *Lamb v. State, supra.* It is universally agreed that there is no such crime as an attempt to commit an assault of the attempted battery variety.

The validity of this narrow statement of the proposition is not, in and of itself, helpful to the appellant, because the crime of burglary in the fourth degree is not an assault.

**B. Statement No. 2: "There Is No Such Crime as an Attempted Attempt"**

██ The statement that there is no such crime as an attempted attempt is broader than the first statement. It is also more valid in that it contains within it the very *raison d'etre* for the first and more narrow statement. There is nothing magical about the predicate crime of assault so as to justify its unique entitlement to the notion now being examined. The validity of the proposition that there is no such crime as an attempted assault of the attempted battery variety

lies not in the substantive content of the term "assault" or the term "battery." It is in the participle "attempted" that modifies the term "battery."

The reason why there cannot be an attempted attempted battery has nothing to do with battery itself but everything to do with the broader principle that there cannot be a cognizable attempted attempt. *Christensen v. State, supra,* gave as the rationale for its holding the fact that an attempted battery, "reduced to its actual meaning," amounted to "an attempt to attempt." 33 Md.App. at 643, 365 A.2d 562. In *Lamb v. State, supra,* we similarly explained that an attempted battery "is already inchoate and there may not be an attempted attempt." 93 Md.App. at 458, 613 A.2d 402.

Clark and Marshall, *A Treatise on the Law of Crimes* (6th ed. by Wingersky, 1958), § 4.08, 218, similarly uses the broader statement of the principle:

> *There can be no such offense as an "attempt to attempt" a crime.* Since a simple assault is nothing more than an attempt to commit a battery, and aggravated assaults are nothing more than attempts to commit murder, rape, or robbery, an attempt to commit an assault, whether simple or aggravated, is not a crime.

(Emphasis supplied).

IV *Wharton's Criminal Law* (14th ed. by Torcia, 1981), § 741, 568, also states the undergirding principle in broader terms:

> *There can be no attempt to commit a crime which is itself an attempt,* i.e., *there can be no attempt to commit an attempt.* Thus, since embracery is itself an attempt to bribe a juror, there can be no attempt to commit embracery. Since an assault is itself an attempt to commit a battery, there can be no attempt to commit an assault.

(Emphasis supplied).

The reason why there cannot be a criminally cognizable attempted attempt, ironically never really explained anywhere, would appear to inhere in the *actus reus* element of the

common law misdemeanor of attempt itself. It is required that the criminal take a substantial step, not necessarily the last step but a substantial. step beyond mere preparation, toward the consummation of the targeted crime. If the step is substantial enough, the first generation attempt has occurred. A certain proximity to the threshold of consummation is required.

In the case of an attempted attempt, by contrast, the second generation attempt is yet another step short of the first generation attempt. If cognizable, it would be an attempt that fell at least two steps short of the ultimate threshold of consummation. As a policy matter, perhaps unspoken, the law will not attenuate the *actus reus* that far backward from the threshold of consummation.

If the law were otherwise, there could be a never ending domino effect backward from the targeted crime. If once the law were to recognize an attempted attempt, there might then be urged upon it an attempted attempted attempt, and so on *ad infinitum* until the *actus reus* would completely disappear into the bare *mens rea.* A perhaps arbitrary, but very sensible, line has been drawn.

The appellant, however, is not yet out of the woods, because a fourth-degree burglary, even of the rogue and vagabond variety, is not literally an attempt. It is now, whatever it once was, a statutory crime with well defined elements. It is capable of being fully consummated in its own right.

## C. Statement No. 4: "There Is No Such Crime as an Attempt to Commit an Inchoate Crime"

Like a World War II artilleryman bracketing his ultimate target, we will leap over, for the moment, the third statement of the proposition and look to the fourth. It is sometimes said that there is no such crime as an attempt to commit an inchoate crime.

That, however, is much too broad a statement, one that wanders far beyond the issue of attempted attempts. What is true of 1) an attempted attempt or 2) an attempt to commit a

crime in the nature of an attempt is not necessarily true of inchoate crimes generally, such as solicitation or conspiracy.

Even many venerable and serious crimes, that have long been accepted target crimes for attempts, are to some extent sometimes inchoate. A fully consummated kidnapping, for instance, may be inchoate to a murder or a rape or an extortion. A fully consummated burglary (or one of its statutory progeny) may be inchoate to a theft or to some other crime intended to be committed on the inside. An arson may be inchoate to a murder or to an insurance fraud.

If a crime has a high enough profile or a significant enough identity, it may be the target of an attempt, notwithstanding the fact that it may to some extent be inchoate to some further and more remote purpose. 2 Wayne R. LaFave and Austin W. Scott, Jr., *Substantive Criminal Law* (1986), § 6.2, 21 addresses this subject.

> [C]ourts have consistently held that *it is permissible to charge and convict for an attempt to commit* a crime, such as *burglary, which is defined in terms of doing an act with intent to commit some other crime.* This is a proper result, for "if a preliminary act is prominent enough to serve as the basis of substantive liability, it should also provide a sufficient foundation for attempt liability." By contrast, where a certain crime is actually defined in terms of either doing or attempting a certain crime, then the argument that there is no crime of attempting this attempt is persuasive.

(Emphasis supplied).

The proposition we are now analyzing cannot be stretched to cover inchoate crimes generally. For the appellant in this case, however, it is not necessary.

### D. Statement No. 3: "There Is No Such Crime as an Attempt to Commit a Crime in the Nature of an Attempt"

█ The statement that there is no such crime as an attempt to commit a crime that is itself in the nature of an attempt is broader than the statement that there may not be

an attempted attempt. An attempt and a crime in the nature of an attempt are not the same thing. It is this statement of the proposition that is critical to the appellant.

Some precedent can be found for this broader articulation. Lewis Hochheimer, *Crimes and Criminal Procedure* (2d ed. 1904), § 266, 297, used the language:

> [I]f an offense is in itself in the nature of an attempt (e.g., assault, embracery) *there can be no such crime as an attempt to commit that offense.*

(Emphasis supplied).

Albeit in dicta, Judge Wilner in *Lane v. State,* 348 Md. 272, 284, 703 A.2d 180 (1997), also uses such language and does so consciously and carefully.

> *There are at least two categories of substantive crimes, to which criminal attempt has been held inapplicable.* The first consists of crimes that do not require at least a general criminal intent. *The second category consists of substantive crimes that are, themselves, in the nature of attempts.* Simple assault is often cited as an example. Although we need not decide the matter here, there may be other crimes as well that may not be suitable for serving as the basis of a criminal attempt.

(Emphasis supplied).

When the police have indications that a crime is being contemplated or attempted, the criminal law serves a preventive purpose. 2 LaFave and Scott, at 22, observes in this regard.

> More bluntly, the law of attempts exists because *there is just as much need to stop,* deter and reform *a person who* has unsuccessfully attempted or *is attempting to commit a crime* than one who has already committed such an offense.
>
> Thus, *one important function served by the crime of attempt is to provide a basis whereby law enforcement officers may intervene in time to prevent a completed crime.* More precisely, *attempt law makes possible preventive action by the police before the defendant has come*

*dangerously close to committing the intended crime;* as one court put it, the police must be allowed "a reasonable margin of safety after the intent to commit the crime was sufficiently apparent to them."

(Emphasis supplied).

Although "crimes in the nature of an attempt" may be ostensibly substantive crimes, 2 LaFave and Scott, at 20–21, explains how they serve the same societal purpose as attempts and share many characteristics with attempts.

It is important to keep in mind that even with this full development of the crime of attempt, *prosecution for attempt is only one of several ways in which the criminal law can reach conduct merely tending toward the doing of some harm otherwise proscribed by law.* The crimes of assault and burglary, which served as a means of dealing with the most common forms of attempt prior to recognition of attempt as a distinct crime, are still very much with us. In addition, even *the most modern codes include crimes defined in terms of conduct* which is arguably of itself harmless but *which has been made criminal because it is* (or is very likely to be) *a step toward the doing of harm.* For example, one modern code includes not only a host of possession-type crimes (e.g., possession of obscene material with intent to disseminate it, possession of a forged instrument with intent to issue or deliver same, *possession of burglary tools with intent to commit a burglary,* possession of explosives or incendiary devices with intent to use them in committing an offense, possession of any instrument adapted for the use of narcotics by subcutaneous injection, possession of weapons with intent to use same against another unlawfully, possession of a gambling device), but also other substantive offenses defined in terms of using certain items for a particular purpose, offering to do something, attracting an intended victim, *or even being in a certain place for a bad purpose.* As will become more apparent later, many (but not all) of these statutes reach conduct which is merely preparatory in nature and which

thus would not be encompassed within the general law of attempts.

(Emphasis supplied). A fourth-degree burglary of subvariety (c) might well be deemed "conduct . . . which has been made criminal because it is . . . a step toward the doing of harm."

■ We are satisfied that subvariety (c) of fourth-degree burglary (and subvariety (d) for that matter) is a crime in the nature of an attempt. Its *actus reus* of being on the property belonging to the dwelling of another has no criminal significance in its own right absent the *mens rea* of an intent to commit theft. The requirement of that *mens rea* makes the defendant's presence at that location a substantial step in attempting a theft.

To be sure, the same observation might also be made about burglary in the first degree and perhaps the two phenomena are simply at different points along the same continuum. That does not mean, however, that being at different points on the same continuum may not have critical significance. The critical difference may be between 1) a very serious *actus reus* with a coincidental intent to commit some further criminal act and 2) a relatively far less serious *actus reus* with a primary intent to commit some further criminal act. Whether a crime qualifies as being in the nature of an attempt may ultimately depend on how much of its collective criminality is wrapped up in its attempt component. The critical difference may be whether the attempt component of a larger crime is its major theme, giving it its essential identity, or only a minor theme.

The term "a crime in the nature of an attempt" may, indeed, require finer tuning in the future on a case by case basis. It would seem that it should not be held to embrace major crimes, capable of full consummation in their own right, simply because they might, coincidentally, contemplate the achievement of some further purpose. The drawing of a final line between Statement # 3 of the proposition under analysis and Statement # 4, however, may have to await *ad hoc* resolution as the cases develop.

## Our Holding

We hold that the rogue and vagabond subvariety of fourth-degree burglary that was the target of the attempt in this case was itself a crime in the nature of an attempt. We further hold that there is no such cognizable crime as an attempt to commit a crime in the nature of an attempt. The appellant, therefore, was convicted of a non-existent crime, and the conviction must be reversed.

**JUDGMENT REVERSED; COSTS TO BE PAID BY BALTIMORE COUNTY.**