882 A.2d 900

**Joseph William MARQUARDT, Jr.**

**v.**

**STATE of Maryland.**

**No. 355, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Sept. 8, 2005.

98

100

106

Brian L. Zavin (Nancy S. Forster, Public Defender, on the brief), Baltimore, for Appellant.

Diane E. Keller (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Panel: SALMON, KENNEY and DEBORAH S. EYLER, JJ.

KENNEY, Judge.

A jury sitting in the Circuit Court for Talbot County convicted Joseph William Marquardt, Jr., appellant, of two counts of second degree assault, two counts of fourth degree burglary, three counts of malicious destruction of property, and one count of false imprisonment. Appellant was sentenced to a total of twenty-three years and four months' incarceration and ordered to pay restitution in the amount of $490.75. He presents four questions on appeal, which we have slightly rephrased as follows:

1. Did the circuit court err in admitting hearsay in violation of appellant's right to confrontation?

2. Did the circuit court err in refusing to instruct the jury on the defenses of necessity, self-defense, and mistake of fact?

3. Did the circuit court err in refusing to propound appellant's requested *voir dire* questions?

4. Did the circuit court err by not merging appellant's sentences for malicious destruction of property into his sentences for burglary?

We agree that, under the facts of this case, separate sentences for malicious destruction of property and fourth degree burglary should not have been imposed. In all other respects, we affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

Appellant met his wife, Catherine Burns, about three years prior to the night of March 16, 2003. When they met, they

both abused alcohol and drugs. Appellant entered a treatment program in September 2002, and testified that he had not used drugs since that time. Appellant also attempted unsuccessfully to obtain help for Burns, calling her parole officer, his parole officer, his rehabilitation counselor, the Family Assistance Network, Social Services, Memorial Hospital at Easton, the State's Attorney's Office, and Burns' parents. He asked clerks at the District Court of Maryland for Talbot County and the Circuit Court for Talbot County about an emergency petition, but was told such an order could not be issued unless Burns had been suicidal in the last 48 hours. Appellant was told to stay away from Burns and to "worry about [his] own self."

In the weeks leading up to March 16, 2003, appellant decided to stop calling Burns and would not take phone calls from her. On March 12, 2003, Burns left a message on appellant's cell phone saying she was at the hospital. Appellant originally "wasn't going to return the call and then . . . said no, I got to call her at the hospital. I've got to see what's wrong with her." He went to the hospital and learned that Burns was pregnant. Appellant was initially unhappy about the pregnancy because he thought Burns was a "crack addict." He had a prior experience with a girlfriend's grandson who was a "crack baby" who was "almost eight years old and never walked, talked . . . [and was] fed through a tube in his stomach." But, appellant reconciled with Burns, and the two made plans to celebrate the pregnancy on March 14, 2003. When appellant returned from work that night, Burns was missing and would not return his phone calls. He searched for two days, and on March 16, 2003, he called a number that Burns had stored in his cell phone for the residence of Robert Lambert. When the man who answered denied knowing Burns, appellant told him: "I'm the last person that you want to get riled up right now. I'm not in no mood for it. I've been looking for her for two days."

Appellant offered $100 to anyone who could provide him with the location of his wife. Shortly thereafter, he was told

he could find Burns at an apartment building on Bay Street in Easton, Maryland. At around 9:30 p.m. on the night of March 16, 2003, appellant broke the glass of the front door at 17 Bay Street, put his hand inside the house, and tried unsuccessfully to unlock the door. Appellant "thought that was the place where [Burns] would be at. Because her car was parked closer to that building several weeks before."

William Lacates, who lived at that address, asked appellant who he was and what he was doing. Appellant told Lacates he was looking for Burns. Lacates replied that no one by that name lived there. Lacates' mother, Robin Patrick, also told appellant that Burns had never been at their residence. Appellant told them that Burns was pregnant with his child, smoking crack cocaine, and that he "wanted to put her into rehab." After 10 or 15 minutes, appellant realized he was at the wrong address, apologized, and offered to pay for the damage to the door. He also requested that Lacates and Patrick not call the police. Appellant's demeanor was described as "[a]ggressive, angry perhaps," but he never threatened to injure anyone in the house.

Appellant proceeded to an apartment building located at 13 Bay Street. Burns was visiting Lambert in apartment 1, and, according to Lambert, the two had smoked crack cocaine that night. Appellant recalled that

> there was a set of doors in front of going into the apartment, into the hallway like a vestibule there. I knocked one of the panes out because it was locked. I unlocked that door and went in ... As soon as I got through the french doors, I went to Apartment 1 and there was like four big panels on the door and I knocked one out closest to where, away from the hinges, closest to where the locks would be up top.

Appellant used a baseball bat to break through the door and saw Burns sitting on the couch with what he believed to be a crack pipe in her hand.[1] As appellant was reaching through

---

1. A baseball bat was recovered from appellant's truck after his arrest, and it was admitted into evidence at trial.

the door, Lambert "jumped up off the other end of the couch" and started running toward him. Appellant testified that he saw something in Lambert's hand and "wasn't going to take a chance," so he hit him once in the head with the baseball bat.

Lambert testified that the last thing he could remember from the night of March 16, 2003, was fixing food in the kitchen. His next memory was waking up at the University of Maryland's Shock Trauma Center with "total loss of hearing in [his] left ear." [2] During trial, Lambert testified that he was still deaf in his left ear, and he was suffering from depression.

Lambert recalled a telephone call from appellant a few days earlier during which appellant had threatened, "if I come over and find Cathy in your apartment I will kill you," but he had never met appellant before. Lambert was asked at trial whether he had a knife in his hand when he was preparing food in the kitchen, and he replied that he "may have had a butter knife with [him] at the time."

After appellant struck Lambert, he grabbed Burns and "halfway drug" her back to his truck. The two struggled with each other inside the truck. According to appellant,

[Burns] kept trying to struggle. We were going down the road and I was hollering. You know, I lost it. I was, I was screaming. I was hollering. And she was trying to get away from, I thought she was going to jump out of the truck. I was trying to hold on [to] her. And I slapped her a few times to try to calm her down, stop her from what, from trying to get out or whatever.

Appellant "slapped her" on "the upper body, the upper torso [area]." [3] Eventually, near Route 50 and Chapel Road, Burns knocked the truck out of gear, and when appellant tried to

_____

2. Lambert was originally taken to Memorial Hospital at Easton, but was flown to the University's Shock Trauma Center in Baltimore because of the extent of his injuries. He spent a total of three days and two nights at the Shock Trauma Center.

3. In appellant's statement to the police, he used the phrase "swung at her a few times and hit her in the general area of the upper body."

grab the gearshift, Burns reached over and shut the ignition off. While appellant was trying to restart the truck, Burns jumped out. She ran toward the median, and appellant drove away.

At approximately 10:06 p.m., Officer James Cathcart was driving down Chapel Road toward Route 50 in a marked patrol vehicle when a motorist flagged him down.[4] As a result of information he received from the motorist, Officer Cathcart drove west on Route 50. He saw a man get into a small white truck on the shoulder of eastbound Route 50 and drive away. When Officer Cathcart stopped his vehicle, he heard a woman's voice calling for help. He found Burns lying on a grassy portion of the median. Burns was without clothes from the waist up and had "what seemed to be blood on her face." She was "emotionally upset," crying to "the point where she was hysterical," and would not talk to Officer Cathcart. He radioed for an ambulance and for an additional unit to come to the scene.

Officer Cathcart put Burns into his patrol car and attempted to calm her down. Still crying, she only gave "bits of information." She told Officer Cathcart that her name was Catherine, that appellant had "assaulted her," that he lived on "Chapel Road," and that "she was at her friend's house, Robert Lambert, on Bay Street."

An ambulance arrived and took Burns to the hospital. Officer Cathcart interviewed Burns at the hospital about one half hour after he had found her. Burns told Officer Cathcart the following:

> [S]he was over a friend's house, Robert Lambert. Her husband came over. Kicked down the door. Hit Mr. Lambert in the head with a baseball bat. She continued to tell me that after Mr. Lambert got hit with the baseball bat he had fell. And then [appellant] hit Ms. Burns with the baseball bat and dragged her out to his truck. Which was

---

4. Officer Cathcart was employed by the Easton Police Department at the time of the incident.

located outside. She said they got into the truck. They headed onto Route 322 which was the bypass. [Appellant] stopped the truck around Ruby Tuesday's that area. Pulled her out of the truck. Started hitting her some more. Ms. Burns told me that she dialed 911 and left the cell phone on so that way the dispatch or whoever could hear her screaming, so she could yell out a location where they were at. They got back in the truck headed back, headed onto Route 322 northbound towards Route 50, heading towards Black and Decker area. They made a right onto Route 50 heading eastbound. Ms. Burns told me they stopped the truck, [appellant] stopped the truck.

After clarifying that Burns' account of the incident was in response to a question, Officer Cathcart continued,

Okay, they made a right on Route 50. [Appellant] stopped the truck in between Route 322 and Joppa Road on the eastbound lane of Route 50 on the shoulder. He then, Ms. Burns then told me that [appellant] dragged her out of the truck into the ditch and started hitting her again. Started choking her. Ms. Burns told me that when [appellant] was choking her that he said, I'm going to kill you. Started choking her again. Ms. Burns said that [appellant] fell. She got up, ran across eastbound traffic into the median, and that's when I pulled up. And that's when [appellant] got into his truck and left.

Sergeant Jarrell of the Easton Police Department, along with several other police officers, went to appellant's home to arrest him. The officers located appellant's vehicle behind the house and were given consent by appellant's house-mate to enter the residence. When Patrolman First Class Robert Bayliss announced that he was going to send his K–9 partner "Nitro" into the house, appellant "came out of the living room with his hands up stating that he was surrendering." Officer Charles Frampton transported appellant to the police station. Appellant told Officer Frampton that his wife had been smoking crack with Lambert and that he had called Lambert earlier that day and told him to stay away from her. As

Officer Frampton was placing appellant in a holding cell, appellant asked: "[W]hat would you have done?"

Officer Greg Fellow testified that he responded to 13 Bay Street and "[s]aw that the glass double doors that lead into the apartment building had one pane broken out of it. There was glass all over the floor." [5] He also "noticed that the apartment number 1, which is the first door on the left, had the top panel broken out of it and there was wood pieces all over the ground, all over the floor, inside and outside the apartment." A steak knife and blood were observed on the floor in the living room and more blood was found in the kitchen.

Officer Fellow saw Lambert and described him as having "cuts on his head and hands and ... a j shaped red mark star[t]ing from the corner of the eye and working its way out to the ear. He also had blood coming out of his [left] ear." Lambert "[c]ouldn't recall a lot of things. He had problems processing questions." No evidence of drugs or drug paraphernalia was recovered from Lambert's residence.

Detective Yvonne Freeman met with Burns at the hospital. According to Detective Freeman, "Ms. Burns was very upset. She was crying.... She had bruises on her, I think around [the] neck. She had some bruises on her face ... [and] there were some bruises on her arms." After Detective Freeman left the hospital, she proceeded to the Easton police station where appellant was being detained. Appellant was read his *Miranda* rights and interviewed by Detective Freeman and Detective Gregory Hall.[6] Appellant's statement was consistent with the facts set out above. A transcript of the statement was admitted into evidence at trial.

As the investigating officer, Detective Hall went to the 911–call center and received a tape recording ("the 911 recording")

---

**5.** Officer Fellow's name is spelled "Fellon" in the transcript, but the circuit court spelled his name as "F-e-l-l-o-w" during *voir dire.*

**6.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

of a phone call made on the night of March 16, 2003. In the 911 recording, the dispatcher attempted to establish a conversation with the caller, but all that can be heard is appellant's and Burns' discourse inside the truck. Appellant yelled at Burns, asking her where she has been, and shouted numerous times, "You want to smoke crack and you're pregnant?" Burns asks appellant throughout the 911 recording to "please stop hitting" her and not to hurt her. Appellant also stated, "I will kill you" several times, to which Burns replied, "Don't kill me, Joe. Don't kill me."

On December 29, 2003, appellant moved *in limine* to preclude admission of the 911 recording. At the motions hearing, appellant averred that Burns was not expected to testify. He argued that the recording was not admissible because the State could not lay a foundation as to who was on the tape; even if the 911 recording was a public record, the statements within it constituted hearsay; the statements on the tape could not be shown to be excited utterances; the dispatcher made inadmissible statements; and its admission would violate appellant's "right to cross examination, his constitutional right." [7] The State responded that the recording was a record kept in the ordinary course of business; Burns' statements were excited utterances; and the tape contained admissions of a party opponent. The prosecutor further argued that there was no confrontation problem because "[i]f hearsay is deemed admissible because it is a recognized exception to the rule, then the opportunity for cross examination [sic] is simply not afforded." [8]

The motions court found that the statements on the 911 recording were "obviously an excited utterance on the part of

---

7. The Sixth Amendment to the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy the right to ... be confronted with the witnesses against him." U.S. Const. Amend. VI.

8. The motion hearing and trial in this case were held prior to the United States Supreme Court decision in *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which held that an out-of-court testimonial statement is inadmissible even if the statement would otherwise conform to a recognized exception to the hearsay rule.

the victim. And it was a recording made by the victim who was not acting as a police agent and not made during the custody or interrogation of the [appellant]." The motions court concluded that the 911 recording was admissible and the identity of the voices on the recording was a question of fact to be resolved by the jury.

The case proceeded to trial on January 20, 2004, and lasted for three days. The 911 recording was admitted into evidence and played for the jury.[9] In his testimony at trial, appellant acknowledged that he heard himself on the 911 recording threatening to kill Burns, but maintained that he did not recall saying it. He conceded that he was "probably more mad at her at that point for what she did than [he] ever [was before]," but stated that he was not mad enough to kill her or the "unborn baby" she was carrying. He maintained that he did not desire to harm anyone, but just wanted to stop Burns from using crack cocaine to protect the "baby" she was carrying.

Burns invoked the spousal privilege and refused to testify against appellant.[10] Her medical records from March 12 and March 13, 2003, were admitted into evidence to prove her toxicology levels and pregnancy. Additionally, her medical records from March 16, 2003, were admitted to show the injuries she suffered that night.

The parties stipulated that April Bishop, Burns' probation officer, Carolyn George, appellant's probation officer, Lauren Carter of the Talbot County Addictions Program, and Sharon Dundin, appellant's addictions counselor, would have testified, if called, that appellant had telephoned them prior to the incident on March 16, 2003, to obtain help in getting Burns off crack cocaine. George would testify that she received numer-

---

9. Upon stipulation of the parties, the tape was not played in its entirety to prevent certain statements made by the 911 dispatcher from being heard.

10. Maryland Code (1974, 2002 Repl. Vol.), § 9–106(a) of the Courts and Judicial Proceedings Article states, in relevant part: "The spouse of a person on trial for a crime may not be compelled to testify as an adverse witness...."

ous calls from appellant, and Dundin would testify that appellant called and spoke to her two to three times a week. Carter would confirm appellant's testimony that he was told that an emergency petition would not work unless Burns was suicidal. The parties further stipulated that George, Carter, and Dundin had all told appellant that there was nothing he could do for Burns and that he should worry about himself.

The parties also stipulated that Lionel H. Howland, an investigator employed by the State's Attorney's Office, would have testified, if called, that "some man called him ... [and] explained to him that his wife was doing crack and that she was pregnant and that he told this individual that based on the information he'd given him there was nothing that [the State's Attorney's Office] could do and advised him not to do anything stupid." Corporal Ronald Mills of the Easton Police Department would have testified that, on March 15, 2003, he responded to the Atlantic Budget Inn for a report of an unwanted subject. He encountered appellant "who was very upset [and] informed the officers that he was looking for his wife who was three months pregnant and who he believed was smoking crack ... Corporal Mills told [appellant] that if he did find his wife he should let the law handle it."

Edward James Tyler, appellant's former employer, testified that appellant had told him that Burns was smoking crack and staying away from home for days at a time. Tyler stated that, in the beginning of 2003, appellant told him that Burns was pregnant and that he did not want her to smoke crack any more. He said that appellant was angry, but mainly concerned for Burns and the baby. He advised appellant that "he needed to get away from [Burns]."

The jury convicted appellant of second degree assault on Lambert, second degree assault on Burns, false imprisonment of Burns, fourth degree burglary at 17 Bay Street, fourth degree burglary at 13 Bay Street, malicious destruction of property at 17 Bay Street, and two counts of malicious de-

struction of property at 13 Bay Street.[11] Additional facts will be presented in our discussion of the issues presented.

## DISCUSSION

### I. Admission of Evidence

Appellant's first contention is that the circuit court erred in admitting three pieces of evidence: the 911 recording; Officer Cathcart's testimony concerning statements Burns made to him while in his patrol car; and Officer Cathcart's testimony concerning statements Burns made to him at the hospital. Appellant argues that each piece of evidence contained hearsay, and that its admission violated appellant's right to confrontation. He contends that none of the statements was an excited utterance, and asserts that all were testimonial in nature, and, thereby, precluded by the United States Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

The State counters that the recording of the 911 call was admissible as a statement by a party opponent and that "[Burns'] statements were admissible, not for their truth, but to put [appellant's] statements in context." The State further contends that appellant's objections to Officer Cathcart's testimony were not preserved for appellate review on Confrontation Clause grounds, and that the statements were admissible under the excited utterance exception to the hearsay rule. Finally, the State argues that any error in permitting the three statements was harmless beyond a reasonable doubt.

### a. Statements Made in the 911 Recording

#### 1. The Confrontation Clause

■ The Confrontation Clause of the United States Constitution provides that, "[i]n all criminal prosecutions, the ac-

---

11. Appellant was found not guilty of attempted second degree murder of Lambert; first degree assault on Lambert; wearing, carrying a dangerous weapon with intent to injure Lambert; wearing, carrying a dangerous weapon with intent to injure Burns; first degree burglary at 17 Bay Street; third degree burglary at 17 Bay Street; first degree burglary at 13 Bay Street; and third degree burglary at 13 Bay Street.

cused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. Amend. VI. The protections of the Confrontation Clause are applicable to the States through the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The Confrontation Clause's counterpart in Maryland's Constitution is found in Article 21 of the Maryland Declaration of Rights, which provides that, "in all criminal prosecutions, every man hath a right ... to be confronted with the witnesses against him," and the two clauses are read in *pari materia.* Md.Code (1958, 2003 Repl. Vol.) Art. 21 of the Constitutions Article. *Craig v. State,* 322 Md. 418, 430, 588 A.2d 328 (1991).

█ In *Crawford v. Washington,* the United States Supreme Court held that,

> [w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law.... Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.

541 U.S. at 68, 124 S.Ct. 1354. The Court of Appeals recently reiterated this principle, stating that, "when an out-of-court statement qualifies as testimonial, the Constitution conditions its admission on the unavailability of the witness and a prior opportunity to cross-examine." *State v. Snowden,* 385 Md. 64, 79, 867 A.2d 314 (2005). In determining whether a statement made by an unavailable declarant is precluded by the Confrontation Clause, the initial focus is directed to whether the statement is "testimonial" in nature. *Id.* If the statement is deemed testimonial, then it is subject to the strict rule enunciated in *Crawford* and reaffirmed by *Snowden,* but if it is nontestimonial, it need only conform to Maryland's rules regarding hearsay.

█ The *Crawford* Court declined to articulate a precise definition of a "testimonial" statement, but noted that "interrogations by law enforcement officers fall squarely within" the meaning. *Crawford,* 541 U.S. at 53, 124 S.Ct. 1354. The

"uniting theme underlying the *Crawford* holding is that when a statement is made in the course of a criminal investigation initiated by the government, the Confrontation Clause forbids its introduction unless the defendant has had an opportunity to cross-examine the declarant." *Snowden*, 385 Md. at 81, 867 A.2d 314. In *Snowden*, the Court of Appeals observed:

> In the context of "police interrogations [or their functional equivalent]," we are directed by *Crawford* to conclude that the proper standard to apply to determine whether a statement is testimonial is whether the statements were made under circumstances that would lead an objective declarant reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 83, 867 A.2d 314. *See also Crawford*, 541 U.S. at 51, 124 S.Ct. 1354 (stating that "various formulations of this core class of 'testimonial' statements exist: '*ex-parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial interrogation, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially' ").

## 2. The 911 Recordings and *Crawford*

■ Appellant asserts that the statements in the 911 recording were testimonial because "[i]t is common knowledge that by calling 911 an alleged victim of a crime creates a record which may be used in a subsequent prosecution." He recognizes that since *Crawford* there is a split of authority regarding the admissibility of 911 recordings, but urges that we find the statements made on the 911 recording in this case to be testimonial.

The State argues that the "better reasoned" cases find 911 calls to be nontestimonial, citing *People v. Corella*, 122 Cal. App.4th 461, 18 Cal.Rptr.3d 770, 775 (2004), which held that 911 recordings "bear no indicia common to the official and formal quality of the various statements deemed testimonial by *Crawford*." The State also asserts that, in this case, "it is unnecessary to resolve the question of whether recordings of

911 calls generally should be considered 'testimonial' under *Crawford."* Here, the recording was a conversation between appellant and Burns with occasional interjections by the dispatcher, and not the typical "report and/or request for help," followed by a series of questions and answers between the caller and dispatcher.

We need not decide whether 911 recordings in general are "testimonial" in nature to resolve the issue before us because it is sufficient to conclude that the 911 recording in this case clearly was nontestimonial. Burns dialed 911 and allowed the phone to remain on while she struggled with appellant. Neither her statements nor the statements of appellant were in response to police questioning or the functional equivalent thereof. There was no "knowing" response to a line of structured questioning taking place in an investigative environment. *Cf. Snowden,* 385 Md. at 84, 867 A.2d 314 (finding under the facts of that case a child's statements to a sexual abuse investigator with the express purpose of creating testimony for a later prosecution constituted the functional equivalent of formal police questioning, and, accordingly, the statements were deemed testimonial).

Furthermore, we disagree with appellant that Burns knew of the evidentiary significance of such a recording when she dialed 911. To the contrary, the primary concern of a reasonable person in Burns' situation would have been escaping or, at the very least, obtaining help, not creating evidence for use in a future prosecution of her assailant. That is consistent with her statement to Officer Cathcart. The evidence at trial established that, in the moments leading up to the 911 recording, appellant dragged Burns out of Lambert's apartment to his truck. Appellant then struggled with Burns in the truck, striking her in the upper body and threatening several times to kill her. We find nothing in the record that suggests Burns knew, or had any objective reason to know, that the statements made during the 911 call could be later used against appellant during his prosecution.

### 3. The 911 Recording and Hearsay

Generally, hearsay is inadmissible as evidence because of its inherent untrustworthiness. *Parker v. State*, 365 Md. 299, 312, 778 A.2d 1096 (2001); Md. Rule 5–802 ("Except as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, hearsay is not admissible."). If a nontestimonial out-of-court statement made by an unavailable declarant contains hearsay, the hearsay must fall within an exception to the hearsay rule or bear "particularized guarantees of trustworthiness" in order to be admitted into evidence. *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).[12] *See also Rollins v. State*, 161 Md.App. 34, 60, 866 A.2d 926 ("the introduction of hearsay will not violate a defendant's right to confrontation if the hearsay is within a 'firmly rooted' exception to the rule against hearsay or bears 'particularized guarantees of trustworthiness' "), *cert. granted*, 387 Md. 462, 875 A.2d 767 (2005).

Maryland Rule 5–803(b)(2) defines the excited utterance exception to the hearsay rule as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." In *Parker*, the Court of Appeals stated:

The essence of the excited utterance exception is the inability of the declarant to have reflected on the events about which the statement is concerned. It requires a startling event and a spontaneous statement which is the result of the declarant's reaction to the occurrence. The rationale for overcoming the inherent untrustworthiness of hearsay is that the situation produced such an effect on the declarant as to render his reflective capabilities inoperative. The admissibility of evidence under this exception is, therefore,

---

12. *Crawford* overruled *Roberts* in the context of testimonial statements, but as indicated in *Crawford* and by a subsequent opinion from this Court, *Roberts* remains authoritative when nontestimonial statements are at issue. *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354; *Rollins v. State*, 161 Md.App. 34, 60, 866 A.2d 926, *cert. granted*, 387 Md. 462, 875 A.2d 767 (2005).

judged by the spontaneity of the declarant's statement and an analysis of whether it was the result of thoughtful consideration or the product of the exciting event.

365 Md. at 313, 778 A.2d 1096 (quoting *Mouzone v. State,* 294 Md. 692, 697, 452 A.2d 661 (1982) (internal citations omitted)).

It is up to the proponent of a statement claimed to be an excited utterance to establish that the statement was spontaneous rather than a result of reflection. *Parker,* 365 Md. at 313, 778 A.2d 1096. " '[I]t must [also] be established that the exciting influence has not lost its sway or been dissipated by meditation.' " *Harmony v. State,* 88 Md.App. 306, 320, 594 A.2d 1182 (1991) (citations omitted). In making the determination of whether a statement is properly characterized as an "excited utterance," we examine the "totality of the circumstances." *West v. State,* 124 Md.App. 147, 163, 720 A.2d 1253 (1998) (quoting *State v. Harrell,* 348 Md. 69, 77, 702 A.2d 723 (1997)). The lapse in time and spontaneity of the statement are factors to be considered in the analysis, but neither is dispositive. *Id.* at 163–64, 720 A.2d 1253.

The determination of whether to admit a statement as an excited utterance lies within the discretion of the trial or motions court. *Harmony,* 88 Md.App. at 321, 594 A.2d 1182. "An appellate court should not reverse a trial [or motions] court's decision on the admissibility of an excited utterance absent an abuse of discretion." *West,* 124 Md.App. at 163, 720 A.2d 1253.

In this case, the motions court found that "obviously [the statements in the 911 recording are] an excited utterance on the part of the victim. And it was a recording made by the victim who was not acting as a police agent and not made during the custody or interrogation of the [appellant]." Indeed, the discourse between Burns and appellant occurred during the commission of an ongoing crime. Burns' supplications for appellant to stop hitting her were in direct response to actions taken by appellant inside the truck. Nothing suggests that the statements were not made spontaneously while under the stress of excitement cased by an "exciting

event." In fact, the 911 recording occurred during the "exciting event," *i.e.*, the assault on Burns inside appellant's truck.[13] Consequently, there was no abuse of discretion in ruling that the statements made by Burns on the recording were excited utterances.

### b. Statement to Officer Cathcart in the Patrol Car

The jury heard Officer Cathcart's testimony concerning the statements Burns made to him while in his patrol car. Appellant asserted that the remarks made in the patrol car constituted "hearsay," and that Burns had calmed down so that "enough time had passed, [and the remarks were] no longer an excited utterance."[14] The circuit court ruled that

---

13. As Chief Judge Murphy points out in his *Maryland Evidence Handbook*, excited utterances "are covered by the phrase *res gestae*" and " 'generally all that is said and done during the commission of a crime is admissible as evidence. In fact, it is difficult to imagine anything occurring or being said while crime is in actual progress that would not be admissible under the res gestae principle....' " Joseph F. Murphy, Jr., *Maryland Evidence Handbook*, § 701 at 259 (3d ed. 1999) (quoting *Hall v. State*, 5 Md.App. 599, 607, 249 A.2d 217 (1969) (followed by *Davis v. State*, 125 Md.App. 713, 718, 726 A.2d 872 (1999))).

14. When a specific ground for objection is raised, our review is limited to the ground stated. *Sifrit v. State*, 383 Md. 116, 136, 857 A.2d 88 (2004) (finding that even a more detailed argument than the one presented at trial is not preserved for appellate review because it would require "trial courts to imagine all reasonable offshoots of the argument actually presented to them before making a ruling on admissibility"). Appellant did not argue before the circuit court that his constitutional right to confront witnesses had been violated by the admission of the statements made to Officer Cathcart in the patrol car, and, accordingly, this argument is not preserved for our review. *See Stoddard v. State*, 157 Md.App. 247, 282, 850 A.2d 406 (2004) (stating that when the objection to the circuit court was based on hearsay, appellant was unable to raise an argument based on *Crawford* because "[a]t trial ... appellant made no mention of the [C]onfrontation [C]lause"); *Williams v. State*, 131 Md.App. 1, 22–24, 748 A.2d 1 (2000) (holding that no objection "on the basis of the Confrontation Clause has in any way been preserved for appellate review in this case" when the specific objection ruled on by the circuit court was "when and how a statement utilized initially as a stimulus for present recollection refreshed might, when it partially fails in that regard, ripen into an exception to the hearsay rule on the ground that it is then an instance of past recollection recorded").

Burns was "still in a state of excitement and that her utterances were excited utterances at that time."

When Officer Cathcart found Burns, she was unclothed from the waist up and had blood on her face. She could not provide an unbroken coherent statement, but rather gave "bits of information." She was crying, "emotionally upset," and "at the point where she was hysterical." The event causing Burns' hysteria had ended only minutes before.[15]

*Dennis v. State,* 105 Md.App. 687, 661 A.2d 175 (1995), is instructive. In *Dennis,* statements were made at the scene of the crime by the defendant's wife, Robin. She invoked the spousal privilege and refused to testify against her husband, who was charged with first-degree murder, burglary, and unlawful use of a handgun. The officer that recorded the statement testified that he arrived " 'within two minutes after he was called,' " and that Robin was " 'very upset, crying, screaming, almost to the point where she was hysterical.' " *Id.* at 700, 661 A.2d 175. Based solely on the officer's testimony concerning Robin's demeanor and state of mind, the circuit court found that the statements were "excited utterances." This Court affirmed stating that, "based on [the officer's] testimony, we can find no error in the court's determination that her immediately contemporaneous statements to the officer related to what obviously was a startling event and were made while she was still under the stress of the excitement caused by that event." *Id.*

In this case, Officer Cathcart testified concerning Burns' demeanor and mental state. He stated that when he appeared on the scene and attempted to question her, Burns was "emotionally upset" and "hysterical." We are not persuaded that the circuit court abused its discretion in admitting Burns' statements as an excited utterance.

---

**15.** The 911 recording began at 9:57:23 p.m. and the dispatcher disconnected at 10:06:46 p.m. Officer Cathcart testified that he arrived on the scene at 10:06 p.m.

### c. Statements to Officer Cathcart at the Hospital

Appellant objected to the statements made by Burns at the hospital, without specifying a basis. The circuit court initially sustained the objection "without some foundation as to what we're speaking of with respect to time frame." The prosecutor established that the statement had been made about a half hour after the incident and Officer Cathcart testified that Burns "was cooperating as far as, she was answering the questions. She was crying off and on. But as far as her mental state she was telling me what she wanted to tell me as far as what happened." The circuit court then overruled the objection and granted appellant's counsel a continuing objection.

A general objection, like the one appellant made to the circuit court, "is sufficient to preserve *all* grounds of objection which may exist." [16] *State v. Jones*, 138 Md.App. 178, 218, 771 A.2d 407 (2001) (quoting *Grier v. State*, 351 Md. 241, 250, 718 A.2d 211 (1998)) (emphasis added). *Compare* footnote 14, *supra* (when there is a specific objection only the grounds specifically stated are preserved for appellate review). On appeal, appellant argues that Burns' statements at the hospital violated his right to confrontation and asserts that they do not fall within any exception to the hearsay rule. We agree that the statements are "testimonial" in nature. *See* discussion, *supra*, Part I(a)(1).

Officer Cathcart visited Burns at the hospital during his investigation of that night's incident. Burns' statements were elicited by a direct question from Officer Cathcart at least a

---

**16.** In *Snowden v. State*, 156 Md.App. 139, 152–53, 846 A.2d 36 (2004), *aff'd*, 385 Md. 64, 867 A.2d 314 (2005), this Court held that *Crawford* applied to the "confrontation" issue as presented in that case, even though the trial had occurred before *Crawford* was decided. *See also Smart v. State*, 58 Md.App. 127, 131, 472 A.2d 501 (1984) (stating that "[w]here the controlling law has changed between the entering of a judgment at trial, and the consideration of the matter on appeal, an appellate court shall apply the law as it exists at the time of appeal"). *Crawford* is part of current Confrontation Clause jurisprudence and is applicable based on appellant's general objection challenging the statements.

half hour after she had been assaulted. Officer Cathcart was clearly investigating the incident and questioning Burns to further the investigation. Although Burns was "crying off and on" she did not "break down in tears ... to any questions [Officer Cathcart] might have asked her." The circumstances were such that a reasonable person would realize that their statements to the police incriminating appellant would be "available for use at a later trial." *Snowden,* 385 Md. at 83, 867 A.2d 314. In fact, the Court of Appeals has said that statements are testimonial when elicited by government officers "with an eye toward trial," and that "statements made to police officers in the course of an investigation [are] especially testimonial." *Id.* at 81, 867 A.2d 314. When statements are "testimonial," *Crawford* dictates that the witness be unavailable and that the accused have a right to cross-examine. *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354. Because Burns invoked the spousal privilege at trial, appellant was not given the opportunity to cross-examine her. Therefore, the statements made by Burns at the hospital were erroneously admitted into evidence.

Even if the statements were not testimonial, they encompassed inadmissible hearsay. Although Burns was "still a little upset" and "crying," "the essence of the excited utterance exception is the inability of the declarant to have reflected on the events about which the statement is concerned." *Parker,* 365 Md. at 313, 778 A.2d 1096. Although the circuit court found the relatively short, half hour time period between the incident and Burns' statement persuasive, time alone is not dispositive. *See Mouzone,* 294 Md. at 701, 452 A.2d 661 (observing that, although the declarant "may still have been somewhat shaken by the incident, it was beyond credibility to suggest that her coherent and descriptive responses" were "impulsive or spontaneous"). There is nothing in Officer Cathcart's description of Burns' mental or emotional state to suggest that she was reacting without deliberation. In fact, Officer Cathcart's testimony was that Burns told him "what

she wanted to tell [him]." The detailed nature and amount of information given to Officer Cathcart also indicates that the statement did not constitute an excited utterance.

 Nevertheless, the State contends that any error in admitting the statements in this case was harmless. "In order for the error to be harmless, we must be convinced, beyond a reasonable doubt, that the error in no way influenced the verdict." *Weitzel v. State*, 384 Md. 451, 461, 863 A.2d 999 (2004). We must " 'be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.' " *Rosenberg v. State*, 129 Md.App. 221, 253, 741 A.2d 533 (1999) (quoting *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976)).

 Maryland Code (2002) § 3–203 of the Criminal Law Article ("C.L.") prohibits a person from committing an assault. C.L. § 3–201 instructs that "assault" encompasses the crimes of assault, battery, and assault and battery, which retain their judicially determined meanings. Battery is traditionally defined as the unlawful application of force against another, either directly or indirectly. *Lamb v. State*, 93 Md.App. 422, 446–48, 613 A.2d 402 (1992). Battery includes "kissing another without consent, touching or tapping another, jostling another out of the way, throwing water upon another, rudely seizing a person's clothes, cutting off a person's hair, throwing food at another, or participating in an unlawful fight. On the other hand, a battery may take the form of a severe beating." *State v. Duckett*, 306 Md. 503, 510–11, 510 A.2d 253 (1986) (internal citations omitted). The crime is committed no matter how slight the injury to the victim. *Lamb*, 93 Md.App. at 447, 613 A.2d 402.

 False imprisonment, a common law offense, is the "unlawful detention of another person against his [or her] will." *Midgett v. State*, 216 Md. 26, 39, 139 A.2d 209 (1958).

"Although there are other possible catalytic agents for the unlawful confinement, such as fraud or a false claim of legal authority, false imprisonment is most frequently the product of either an assault or a battery." *Lamb,* 93 Md.App. at 470–71, 613 A.2d 402 (footnote omitted).[17]

 Burns' recollection of the night, for the most part, mirrors that of appellant's own testimony and police statement. Burns told Officer Cathcart that while she was visiting Lambert, appellant "[k]icked down the door" and "[h]it Mr. Lambert in the head with a baseball bat." The only contradictory assertion made by Burns was that appellant threw her out of the truck (he says that she jumped out of the truck) and that appellant also hit her with the baseball bat. Appellant admitted during trial and in his statement to the police, which was admitted into evidence, that he broke into the homes located at 13 and 17 Bay Street, that he hit Lambert with the baseball bat, that he dragged Burns out to his truck, and that he would not let her leave. These admissions by appellant provided ample evidence to convict him of the second degree assault on Lambert and the false imprisonment of Burns. Appellant also admitted, both at trial and in his statement to the police, to striking Burns in the upper body with his hands. These admissions, along with Burns' medical records from the night of the incident, clearly established that appellant was guilty of the second degree assault on Burns.

Defense counsel stated in his opening argument, "[i]t's really not a question so much of what happened but why it happened." In closing argument, he summarized the essence of the defense theory by asking the jurors "what would you have done differently." We are convinced beyond a reasonable doubt that the statements made by Burns at the hospital in no way influenced the verdict in this case. Consequently, any error was harmless.

---

17. The statements had little or no bearing on appellant's convictions for burglary or for malicious destruction of property.

## II. Jury Instructions

Maryland Rule 4–325(c) provides, in pertinent part, that "[t]he court may, and at the request of any party shall, instruct the jury as to the applicable law." When requested to do so by a party, the trial court is required to give an instruction that correctly states the applicable law if it has not been fairly covered in the instructions actually given. *State v. Martin*, 329 Md. 351, 356, 619 A.2d 992 (1993); *Mack v. State*, 300 Md. 583, 592, 479 A.2d 1344 (1984). The circuit court need not give the instruction, however, unless the defendant has produced "some evidence" sufficient to give rise to a jury issue on the defense. *Dykes v. State*, 319 Md. 206, 216, 571 A.2d 1251 (1990). The phrase some evidence, "calls for no more than what it says—'some,' as that word is understood in common, everyday usage. It need not rise to the level of 'beyond a reasonable doubt' or 'clear and convincing' or 'preponderance.'" *Id.* at 216–17, 571 A.2d 1251.

"Whether the evidence is sufficient to generate the desired instruction is a question of law for the judge." *Roach v. State*, 358 Md. 418, 428, 749 A.2d 787 (2000). Our review is limited to determining "whether the criminal defendant produced that minimum threshold of evidence necessary to establish a *prima facie* case that would allow a jury to rationally conclude that the evidence supports the application of the legal theory desired." *Id.* There must be "some evidence," to support each element of the defense's legal theory before the requested instruction is warranted. *Cantine v. State*, 160 Md.App. 391, 411, 864 A.2d 226 (2004) (holding that a renunciation instruction for the crime of conspiracy was not warranted when "although the record provide[d] sparse evidence of [appellant's] involvement in the conspiracy . . . there [was] no evidence of an affirmative withdrawal from the conspiracy"), *cert. denied*, 386 Md. 181, 872 A.2d 46 (2005); *Sutton v. State*, 139 Md.App. 412, 428–29, 776 A.2d 47 (2001) (holding that a voluntary intoxication instruction was not warranted when "no evidence was established at trial of any impairment of [appellant's] ability to form the specific intent to commit robbery at the time of the murder").

## a. Necessity

Appellant requested that the circuit court instruct the jury on the defense of necessity. The instruction appellant requested was:

An act which would otherwise be a crime may be excused if the person accused can show that it was done only in order to avoid consequences which could not otherwise be avoided, and which, if they had followed, would have inflicted upon him, or upon others whom he was bound to protect, inevitable and irreparable evil; that no more was done than was reasonably necessary for that purpose; and that the evil inflicted by it was not disproportionate to the evil avoided. [FN1]

If you find that the Defendant acted out of necessity or out of duress of circumstances, then you must find the Defendant not guilty.

[FN1] *Frasher v. State of Maryland,* 8 Md.App. 439, 449[n. 6], [260 A.2d 656] (1970) (quoting *Stephen, Digest of the Criminal Law,* art. 32).

Appellant argues that the defense was applicable because he faced a choice between acting to prevent his wife from abusing drugs or doing nothing, "thereby risking that his wife's placenta would break loose and she would bleed to death and/or that their child would die or be born with serious disabilities." The State counters that the defense was not applicable because "the crimes were disproportionate to the threat," and "the threatened harm is future, rather than immediate, personal injury." Furthermore, the State asserts that the defendant had other alternatives than resorting to violence, such as continuing to convince Burns to seek treatment.

We begin with a discussion of the defense of necessity. The Court of Appeals held in *State v. Crawford,* 308 Md. 683, 698–99, 521 A.2d 1193 (1987) (footnote omitted), that

necessity is a valid defense to the crime of unlawful possession of a handgun when five elements are present: (1) the defendant must be in present, imminent, and impending peril of death or serious bodily injury, or reasonably believe himself or others to be in such danger; (2) the defendant

must not have intentionally or recklessly placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct; (3) the defendant must not have any reasonable, legal alternative to possessing the handgun; (4) the handgun must be made available to the defendant without preconceived design, and (5) the defendant must give up possession of the handgun as soon as the necessity or apparent necessity ends. We emphasize that if the threatened harm is property damage or future personal injury, the defense of necessity will not be viable; nor can the defense be asserted if the compulsion to possess the handgun arose directly from the defendant's own misconduct.

Similarly, this Court determined that

a limited defense of necessity is available to an individual charged with the crime of escape if the following conditions exist:

'(1) The prisoner is faced with a specific threat of death, forcible sexual attack or substantial bodily injury in the immediate future;

(2) There is no time for a complaint to the authorities or there exists a history of futile complaints which makes any result from such complaints illusory;

(3) There is no time or opportunity to resort to the courts;

(4) There is no evidence of force or violence used towards prison personnel or other 'innocent' persons in the escape; and

(5) The prisoner immediately reports to the proper authorities when he has attained a position of safety from the immediate threat.'

*Robinson v. State*, 42 Md.App. 617, 621, 402 A.2d 115 (1979) (citations omitted).

 Maryland appellate courts have had only two occasions to address the defense of necessity outside the specific contexts of possession of a handgun and escape from prison. In *Frasher v. State*, this Court stated that "[i]t is essential to a crime that the [appellant] committed a voluntary act," there-

fore, "it is a defense as to all crimes except taking the life of an innocent person that the [appellant] acted under a compelling force of coercion or duress." *Frasher,* 8 Md.App. at 447–48, 260 A.2d 656. This "compulsion may be by necessity, that is duress arising from circumstances, or by the application of duress on the defendant by another person." *Id.* at 448, 260 A.2d 656. Quoting "R. Perkins, *Criminal Law,* 847 (1957)," the *Frasher* Court stated: " 'If a choice exists but only between two evils, one of which is the commission of a wrongful act, and the emergency was not created by the wrongful act of another person it is spoken of as an act done in a case of necessity.' " *Id.* at 448, 260 A.2d 656. Judge Orth, writing for the Court, elaborated on the type of emergency contemplated by the defense:

> [C]ourts have recognized necessity as an excuse where, for example, a person is unavoidably caught in a traffic jam, holding that he is not guilty of violating the law which prohibits stopping at that place; and a vessel is not liable for a violation of the embargo laws where, during a legitimate voyage, she is obliged by stress of weather to take refuge in a proscribed port.

*Id.* The *Frasher* Court determined that the defense did not apply to the facts of that case because "in a prosecution for an offense not requiring intent, as are the offenses here [possession and control of heroin], the defense of necessity is not available, at least where the defendant could have avoided the emergency by taking advance precautions." *Id.* at 448–49, 260 A.2d 656.

The Court of Appeals again considered the defense of necessity in *Sigma Reproductive Health Center v. State,* 297 Md. 660, 675–76, 467 A.2d 483 (1983), stating:

> "One who, under the pressure of circumstances, commits what would otherwise be a crime may be justified by 'necessity' in doing as he did and so not be guilty of the crime in question. With the defense of necessity, the pressure must come from the physical forces of nature (storms, privations) rather than from other human beings. (When the pressure is from human beings, the defense, if

applicable, is called duress rather than necessity.) Also, the pressure must operate upon the mind of the defendant rather than upon his body. (When **A** and **B** are standing atop a precipice, and an earthquake causes **A** to stumble against **B,** throwing **B** over the cliff to his death, **A's** defense to a homicide charge is not that of necessity, for **A's** mind did not will his body against **B's;** instead, his defense is that he did no 'act' (a willed movement), and one cannot be guilty of a crime of action without an act.) But when **A,** starving to death, takes and eats **B's** food to save his own life, or when **A** in an emergency intentionally kills **B** to save **C** and **D,** he may be eligible for the defense of necessity.

The rationale of the necessity defense is not that a person, when faced with the pressure of circumstances of nature, lacks the mental element which the crime in question requires. Rather, it is this reason of public policy: the law ought to promote the achievement of higher values at the expense of lesser values, and sometimes the greater good for society will be accomplished by violating the literal language of the criminal law."

(quoting W. LaFave & A. Scott, Jr., *Criminal Law* § 50 (1972)).

■■■ The Court noted five elements necessary to consider before applying the defense of necessity:

"1—The harm avoided—this need not be physical harm but also may be harm to property as, for instance, where a firefighter destroys some property to prevent the spread of fire which threatens to consume other property of greater value.

2—The harm done—this is not limited to any particular type of harm but includes intentional homicide as well as intentional battery or property damage. An illustration is supplied:

'[A]s where **A,** driving a car, suddenly finds himself in a predicament where he must either run down **B** or hit **C's** house and he reasonably chooses the latter, unfortunately killing two people in the house who by bad luck happened to be just at that place inside the house where **A's** car struck—

it is the harm-reasonably-expected, rather than the harm-actually-caused, which governs.'

3—Intention to avoid harm—to have the defense of necessity, the defendant must have acted with the intention of avoiding the greater harm. Actual necessity, without the intention, is not enough. However, an honest and reasonable belief in the necessity of his action is all that is required.

4—The relative value of the harm avoided and the harm done. The defendant's belief as to the relative harmfulness of the harm avoided and the harm done does not control. It is for the court, not the defendant, to weigh the relative harmfulness of the two alternatives. To allow the defense the court must conclude that the harm done by the defendant in choosing the one alternative was less than the harm which would have been done if he had chosen the other.

5—Optional courses of action; imminence of disaster. The defense of necessity applies when the defendant is faced with this choice of two evils: he may either do something which violates the literal terms of the criminal law and thus produce some harm, or not do it and so produce a greater harm. If, however, there is open to him a third alternative, which will cause less harm than will be caused by violating the law, he is not justified in violating the law. For example, "[a] prisoner subjected to inhuman treatment by his jailors is not justified in breaking prison if he can bring about an improvement in conditions by other means." "

*Id.* at 678–79, 467 A.2d 483.

Applying the law to the facts of that case, the Court concluded that Debra Braun was not acting in necessity when she criminally trespassed on the grounds of Sigma Reproductive Health Center to demonstrate against abortion because there were alternatives that would not have involved breaking the law.[18] *Id.* at 689–90, 467 A.2d 483. The Court held that

---

18. The Court stated that disciplinary actions could be filed against the doctors and information could have been distributed to patients that warned of any dangers posed by the clinic.

"necessity is not a valid defense for criminal trespass charges involving political or moral protest, particularly those involving abortion clinics." *Id.* at 681, 467 A.2d 483.

The teachings from these cases makes clear that, in order for the defense of necessity to have been warranted in this case, appellant must have presented "some evidence" that there was a choice between two evils, that no legal alternatives existed, that the harm appellant caused was not disproportionate to the harm avoided, and that the emergency was imminent. *See id.* at 678–79, 467 A.2d 483; *Frasher,* 8 Md.App. at 448, 260 A.2d 656. Appellant runs afoul of the last requirement, or namely, that the emergency he was seeking to prevent was imminent.

Appellant testified, without corroboration, that he called a hospital the night of the incident and was told if Burns continued to use cocaine she might suffer internal bleeding from a ruptured placenta later during pregnancy, but there was no evidence of an immediate or imminent danger that would warrant appellant acting in the manner that he did. Rather than helping, his actions could have caused more serious harm to Burns and perhaps a miscarriage terminating her pregnancy.[19] In addition, Lambert could have been more seriously injured or even killed. A tenuous relationship between present actions and a possible future harm is not enough to support a necessity instruction. *Sigma,* 297 Md. at 688–90, 467 A.2d 483. Other jurisdictions have reached similar conclusions. *See, e.g., United States v. Kroncke,* 459 F.2d 697, 701 (8th Cir.1972) (stating that the "defense of necessity applied only in emergency situations where the peril is instant and overwhelming" and was not a defense to interfering with

19. The General Assembly recently passed H.B. 398, which establishes that "a prosecution may be instituted for murder or manslaughter of a viable fetus." H.398, 2005 Leg., 420 Sess. (Md. 2005). A fetus is deemed viable if, "in the best medical judgment of the attending physician based on the particular facts of the case before the physician, there is a reasonable likelihood of the fetus's sustained survival outside the womb." Md.Code (1982, 2005 Repl. Vol.), § 20–209 of the Health General Article.

the Selective Service Act); *People v. Galambos,* 104 Cal. App.4th 1147, 128 Cal.Rptr.2d 844, 855 (2002) (citations omitted) (holding that a "defendant is 'not entitled to a claim of duress or necessity [for harvesting marijuana] unless and until he demonstrates that, given the imminence of the threat, violation of [the law] was the only reasonable alternative' "); *State v. Harrison,* 473 N.W.2d 242, 244 (Iowa Ct.App.1991) (stating "fears of future injuries do not excuse an offence [of driving while intoxicated]" and "the necessity defense does not apply except in emergency situations where the threatened harm is immediate and the threatened disaster imminent").

Appellant did not establish a *prima facie* case of necessity. Accordingly, the circuit court did not err in refusing to give a defense of necessity instruction.

### b. *Mistake of Fact*

 Appellant contends that, "[a]ssuming that the lower court erred by failing to instruct the jury on necessity of circumstances, it further erred in denying [appellant's] request for an instruction on mistake of fact." [20] He asserts that his belief in breaking into 17 Bay Street instead of 13 Bay Street to retrieve Burns was reasonable, "given the information he

---

**20.** Maryland Pattern Jury Instructions–Criminal 5:06 sets forth the requirements for the defense of mistake of fact:

You have heard evidence that the defendant's actions were based on a mistake of fact. Mistake of fact is a defense and you are required to find the defendant not guilty if all of the following three factors are present:

(1) the defendant actually believed (alleged mistake);

(2) the defendant's belief and actions were reasonable under the circumstances; and

(3) the defendant did not intend to commit the crime of (crime) and the defendant's conduct would not have amounted to the crime of (crime) if the mistaken belief had been correct, meaning that, if the true facts were what the defendant thought them to be, the [defendant's conduct would not have been criminal] [defendant would have the defense of (defense)].

In order to convict the defendant, the State must show that the mistake of fact defense does not apply in this case by proving, beyond a reasonable doubt, that at least one of the three factors previously stated was absent.

had regarding her location as well as the general stress and excitement of the moment," and that "had the address been correct, [his] actions would have been justified under the defense of necessity. Therefore, the refusal to provide the instruction on mistake of fact was error."

▮▮▮ In other words, he contends that, acting out of necessity, he could reasonably break into 13 Bay Street, and that he mistakenly entered 17 Bay Street, which was reasonable under the circumstances. A necessary element of the mistake of fact defense is that his conduct would not have amounted to a crime had the circumstances been as he believed them to be. Appellant's mistake of fact argument is based on his necessity defense and fails with the failure of that defense. Appellant was not justified in breaking into either 13 or 17 Bay Street.

### c. Self–Defense

Appellant asserts that "Lambert ran at him, cursing and holding an object in his hand. There was evidence from which the jury could have inferred that the object was a knife.[21] Not willing to take any chances, [appellant] hit [Lambert] once with the bat." He contends he acted in self-defense because he "actually, and reasonably, believed that he was in immediate or imminent danger of bodily harm, he used no more force than was reasonably necessary to defend himself, and he was not the aggressor in the sense that he did not bring the bat with him with the intention of fighting anyone." The State counters that the defense is inapplicable because "[appellant] was the first aggressor: he smashed through Lambert's door and entered Lambert's home carrying a bat."

▮▮▮ The requirements for self-defense are well established,[22]

---

**21.** Lambert referred to a "butter knife," and Officer Fellow found a "steak knife" on the floor of Lambert's residence.

**22.** Maryland recognizes both perfect and imperfect self-defense. *State v. Smullen*, 380 Md. 233, 251, 844 A.2d 429 (2004). Perfect self-defense occurs when the belief of danger is subjectively held by the accused and

(1) The accused must have had reasonable grounds to believe himself [or herself] in apparent imminent or immediate danger of death or serious bodily harm from his [or her] assailant or potential assailant;

(2) The accused must have in fact believed himself [or herself] in this danger;

(3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and

(4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*Roach*, 358 Md. at 429–30, 749 A.2d 787 (citations omitted) (alterations in *Roach*).

We have recognized that the perpetrator of a robbery has no right to defend himself, stating:

The premise of an accused being permitted to raise the defense of self-defense to the charge of robbery borders on the absurd, and is a variation of the old shibboleth of the individual who murders both his parents and then throws himself on the mercy of the court as an orphan. We reject such reasoning by the "orphan" in this case.

*Sutton v. State*, 139 Md.App. 412, 454, 776 A.2d 47 (2001).

■■■ Here, appellant admitted breaking into Lambert's apartment with a baseball bat. Although appellant may have only brought the bat to gain entrance to the apartment and not to physically injure anyone, he provoked the conflict by breaking into Lambert's home. It was Lambert, not appellant, who was entitled to defend himself. *Redcross v. State*, 121 Md.App. 320, 328 n. 4, 708 A.2d 1154 (1998) (stating "even at the deadly force level ... there is no duty to retreat if one is attacked in his or her own home"). Appellant clearly

is objectively reasonable, while imperfect self-defense occurs when the actual subjective belief on the part of the accused is not objectively reasonable. *Id.* A common element to both forms of self-defense is that the accused "must not have been the aggressor or provoked the conflict." *Id.* at 269, 844 A.2d 429.

provoked the conflict and consequently, he cannot meet the third element of self-defense.

■ Appellant also argues that he took the bat with him because "his wife may have been in the company of violent individuals." We acknowledge that the privilege of self-defense is not necessarily forfeited by arming one's self in anticipation of an attack, but that right is qualified by the proviso that the right only extends to "one who [was] not in any sense seeking an encounter." *Perry v. State*, 234 Md. 48, 52, 197 A.2d 833 (1964); *see Marr v. State*, 134 Md.App. 152, 183, 759 A.2d 327 (2000). Here, appellant provoked the encounter by breaking and entering into Lambert's apartment. The circuit court did not err in refusing to instruct the jury on self-defense.

### III. Voir Dire

Appellant proposed the following questions for *voir dire* that the circuit court declined to ask:

No. 11: Is there any member of the jury panel who feels as though simply because a charge is brought by a police officer and prosecuted by the State's Attorney's Office the charge is probably correct and the Defendant is guilty?

No. 12: Under the Constitution of the United States and the Maryland Law the burden remains throughout the trial on the State to convince you, the finders of fact, beyond a reasonable doubt that the Defendant is guilty? Would anyone have trouble complying with this?

No. 14: Is there anyone who thinks the Defendant should be required to prove his innocence?

No. 15: If Defendant testifies, would you be able to weigh his testimony in the same manner as the testimony of other witnesses?

The circuit court did not ask questions 11, 12, and 14 because it believed that the jury instructions given at the close of all evidence would sufficiently cover the subject matter in question. With respect to question 15, the following colloquy occurred:

THE COURT: I'm not even sure, I'm not sure I understand what that means.

[DEFENSE COUNSEL]: In other words not give it any more or less weight merely because he is the Defendant in the case.

THE COURT: You don't want them to give it just a little more?

[DEFENSE COUNSEL]: Well, that would be great but I'm hearing the flip side.

THE COURT: I think it's pretty neutral without giving it, it's going to end up being neutral if we do give it so I see nothing to be gained by it.

Appellant asserts that the circuit court erred in not asking questions based on a defendant's presumption of innocence and that "a juror who could not accept this basic precept would be subject to being stricken for cause." Appellant recognizes that the Court of Appeals in *Twining v. State*, 234 Md. 97, 100, 198 A.2d 291 (1964), held that it was inappropriate "to question the jury [during *voir dire* ] as to whether or not they would be disposed to follow or apply stated rules of law" because they are "covered in subsequent instructions to the jury." He argues that *Twining* is outmoded because it "was decided at a time when juries were genuinely the judges of the law in Maryland and the [circuit] court's instructions were not binding."

The State argues that "the principle that [*voir dire* ] questions need not encompass matters that will be covered in the jury instructions is alive and well in Maryland." The State also contends that appellant acquiesced to the circuit court's rulings by "not disput[ing] the court's analysis, nor object[ing] in any other way" and by stating that the jury panel was acceptable.

### a. Acquiescence

Maryland Rule 4–323(c) governs the manner of objections during jury selection. *Baker v. State*, 157 Md.App. 600, 609, 853 A.2d 796 (2004); *Newman v. State*, 156 Md.App. 20, 50–51,

845 A.2d 71 (2003), *reversed on other grounds,* 384 Md. 285, 863 A.2d 321 (2004). The Rule provides, in pertinent part, that

> it is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court. The grounds for the objection need not be stated unless these rules expressly provide otherwise or the court so directs.

Md. Rule 4–323(c).

■■■ We have held that it is sufficient to preserve an objection during the *voir dire* stage of trial simply by making known to the circuit court "what [is] wanted done." *Baker,* 157 Md.App. at 610, 853 A.2d 796. Here, after being asked if there were any problems with *voir dire,* appellant told the circuit court that he objected to his proposed questions 11, 12, 14, and 15 not being asked. Appellant was not required by Maryland Rule 4–323(c) to preserve the record in any other way. Moreover, accepting the jury that is ultimately selected after the circuit court has refused to propound requested *voir dire* questions does not constitute acquiescence to the previous adverse ruling. *Fowlkes v. State,* 117 Md.App. 573, 580, 701 A.2d 862 (1997); *Ingoglia v. State,* 102 Md.App. 659, 664, 651 A.2d 409 (1995). *Compare Gilchrist v. State,* 340 Md. 606, 617, 667 A.2d 876 (1995) (stating that a claim of error in the inclusion or exclusion of a prospective juror or jurors " 'is ordinarily abandoned when the defendant or his counsel indicates satisfaction with the jury at the conclusion of the jury selection process' ").

### b. Jury Selection in this Case

■■■ The scope of *voir dire* and the form of the questions propounded rests firmly within the discretion of the circuit court. *Hill v. State,* 339 Md. 275, 279, 661 A.2d 1164 (1995); *Davis v. State,* 333 Md. 27, 34, 633 A.2d 867 (1993). The overriding purpose of *voir dire* is to ascertain the existence of cause for the disqualification of potential jurors. *Hill,*

339 Md. at 279, 661 A.2d 1164. The "Maryland Declaration of Rights Article XXI guarantees a defendant the right to examine prospective jurors to determine" whether cause for disqualification exists. *Bedford v. State,* 317 Md. 659, 670, 566 A.2d 111 (1989). Failure to allow questions that may show cause for disqualification is an abuse of discretion constituting reversible error. *Casey v. Roman Catholic Archbishop,* 217 Md. 595, 605, 143 A.2d 627 (1958).

We begin by stating that this Court has not, nor could it, retreat from *Twining.* We have consistently held that *voir dire* need not include matters that will be dealt with in the jury instructions. *Baker,* 157 Md.App. at 616–17, 853 A.2d 796; *Bernadyn v. State,* 152 Md.App. 255, 283, 831 A.2d 532 (2003), *cert. granted,* 378 Md. 613, 837 A.2d 925 (2003); *Wilson v. State,* 148 Md.App. 601, 656–67, 814 A.2d 1 (2002); *Carter v. State,* 66 Md.App. 567, 576–77, 505 A.2d 545 (1986). As we have recently stated, "it is up to the Court of Appeals, not this Court, to decide, as appellant suggests, that the reasoning of *Twining* is 'now outmoded.'" *Baker,* 157 Md. App. at 618, 853 A.2d 796. Accordingly, we perceive no abuse of discretion in the circuit court's failure to propound questions 11, 12, and 14.

Appellant cites *Bowie v. State,* 324 Md. 1, 595 A.2d 448 (1991), in support of his argument that it was an abuse of discretion not to propound question 15. In *Bowie,* the following three questions were requested by the defense: whether a juror believed a police officer would be likely to tell the truth; whether a juror would believe a police officer more than a civilian witness; and whether a juror would "tend to view the testimony of witnesses called by the Defense with more skepticism than witnesses called by the State, merely because they were called by the Defense." *Bowie,* 324 Md. at 6, 595 A.2d 448. The Court of Appeals observed that, "[w]hile related, the three questions appellant requested were aimed at identifying two categories of venirepersons: (1) those who would believe police officers, simply because they were police officers, and

(2) those who would prefer the testimony of State's witnesses over defense witnesses." *Id.* at 7, 595 A.2d 448.

Appellant's reliance on *Bowie* is misplaced because, here, the circuit court identified both categories of venirepersons when it asked:

Would any member of the prospective jury panel be inclined to give more weight or less weight to the testimony of a police officer or prosecution witness than to another witness merely because he or she is a police officer or a witness for the prosecution? If so please stand.

(Clerk records responses.)

THE COURT: Is there anyone else who feels that they would give more weight or less weight to the testimony of a police officer or a witness for the prosecution than to another witness merely because he or she is a witness for the prosecution or police officer?

The present case is more like *Bernadyn v. State,* where we concluded that the circuit court was not required to ask a specific *voir dire* question regarding the weight the jury panel would give the defendant's testimony when it asked a more general question tailored toward ferreting out bias in favor of the State. *Bernadyn,* 152 Md.App. at 283, 831 A.2d 532. In *Bernadyn* we stated:

Appellant contends that the question regarding weight to be given to the testimony of a criminal defendant is similar to mandatory inquiries regarding the weight to be given to the testimony of police officers. Essentially, the question seeks to determine whether jurors would have a bias against appellant merely because he was accused of a crime and therefore give his testimony less weight than the testimony of other witnesses such as police officers.

We first note that the court questioned the venire regarding biases in favor of or against the testimony of police officers. The issue was adequately addressed by the court. Second, the court asked the venire whether members would "tend to view the witnesses called by the defense with more or less skepticism than witnesses called by the State[.]"

The question is a broader version of that requested by appellant. The actual question posed to the venire would reveal not only bias towards appellant's testimony but also towards those witnesses testifying on appellant's behalf. Consequently, we find that the questions given by the court were sufficient to meet the mandatory requirements.

*Id.* at 283–284, 831 A.2d 532. *Accord Baker,* 157 Md.App. at 615, 853 A.2d 796 (finding no error in refusing to propound a question concerning the weight given to a defendant's testimony when the circuit court has already addressed whether the jurors would give more weight to the State's witnesses).

We are persuaded that the question given in this case was sufficient because it was a "broader version" of the question requested by appellant. Appellant's requested question was: "If Defendant testified, would you be able to weigh his testimony in the same manner as the testimony of other witnesses?" The question asked by the circuit court included whether the potential juror would give more or less weight to "a witness for the *prosecution than to another witness* merely because he or she" was a witness for the prosecution. (Emphasis added). The question propounded by the circuit court would reveal not only bias in favor of the State, but also any bias against any defense witness, which would, of course, include appellant. It was not an abuse of discretion for the circuit court to forego asking question 15.

## IV. Merger

At sentencing, defense counsel suggested that "perhaps the crime of malicious destruction of property would merge in the fourth degree burglary as the only destruction of property was the breaking, that was the necessary element of the fourth degree burglary." Relevant to this argument, the circuit court sentenced appellant as follows:

Count 12, fourth degree burglary at 17 Bay Street: 3 years' incarceration;

Count 13, malicious destruction of property at 17 Bay Street: 60 days' incarceration consecutive to Count 12;

Count 16, fourth degree burglary at 13 Bay Street: 3 years' incarceration consecutive to Count 13;

Count 18, malicious destruction of inside door at 13 Bay Street, merges with Count 16, fourth degree burglary at 13 Bay Street;

Count 17, malicious destruction of outside door at 13 Bay Street, 60 days' incarceration consecutive to Count 3 [second degree assault on Lambert] and restitution in the amount of $490.75.[23]

Appellant contends that the circuit court "apparently agreed" that the sentences should merge because he, in fact, merged the sentence for malicious destruction of property of Lambert's apartment door with the fourth degree burglary conviction at that residence, but "inexplicably imposed consecutive sentences for the remaining count of malicious destruction [of property] at 13 Bay Street as well as the count pertaining to 17 Bay Street." Appellant argues that "[b]ecause the legislature may not intend that separate sentences be imposed for two offenses arising out of the same transaction, the rule of lenity requires that any doubt concerning legislative intent be resolved in favor of the defendant." He also asserts that "fundamental fairness" requires merger because

the elements of malicious destruction of property were integral to the burglary charges. Indeed, it is difficult to imagine any burglary in which there is not some concomitant destruction of property. By enacting separate statutes, the General Assembly clearly did not intend that the destruction of property incidental to a burglary be separately punished from the burglary.

The State responds that the two offenses "are plainly distinct" and do not merge under the required elements tests. It also asserts that the offenses do not satisfy the rule of lenity because they "are not of necessity intertwined, nor is

---

**23.** We note that, although the circuit court's language indicates that restitution was only imposed for Count 17, the actual amount awarded appears to include both Counts 17 and 18.

one necessarily the over[t] act of the other. They involve two separate kinds of injuries to the victim-an intrusion into the victim's dwelling and the destruction of the victim's property-and should therefore be punished separately." Finally, the State argues that principles of fundamental fairness do not apply because both offenses are statutory.

### a. The Required Evidence Test

In Maryland, the required evidence test is usually used to determine whether two offenses arising out of the same act merge. *In re Michael W.*, 367 Md. 181, 186, 786 A.2d 684 (2001); *Williams v. State*, 323 Md. 312, 316, 593 A.2d 671 (1991). The required evidence test, also known as the "same evidence test," the "Blockburger test," or the "elements test," applies equally to statutory and common law offenses. *Dixon v. State*, 364 Md. 209, 237, 772 A.2d 283 (2001). The focus is on the " 'elements of each offense; if all of the elements of one offense are included in the other offense, so that only the latter offense contains a distinct element or distinct elements, the former merges into the latter.' " *Williams*, 323 Md. at 317, 593 A.2d 671 (citations omitted).

The Court of Appeals has explained recently that, in the context of double jeopardy:

"The required evidence test is that which is minimally necessary to secure a conviction for each ... offense. If each offense requires proof of a fact which the other does not, or in other words, if each offense contains an element which the other does not, the offenses are not the same for double jeopardy purposes even though arising from the same conduct or episode. But, where only one offense requires proof of an additional fact, so that all elements of one offense are present in the other, the offenses are deemed to be the same for double jeopardy purposes."

*Anderson v. State*, 385 Md. 123, 131, 867 A.2d 1040 (2005) (citations omitted).

Appellant does not contend that the offenses merge under the required evidence test, and, indeed, this Court

explicitly held in *Christian v. State*, 65 Md.App. 303, 308–09, 500 A.2d 341 (1985), *affirmed on other grounds*, 309 Md. 114, 522 A.2d 945 (1987), that breaking and entering and malicious destruction of property do not merge under the required evidence test. We reasoned that

> [m]alicious destruction requires proof that the accused had a specific intent to destroy, injure, deface or molest the real or personal property of another. The crime of breaking and entering requires proof of the accused's specific intent to break and enter the dwelling house of another. Clearly, the intent to break and enter is different from an intent to destroy, injure, deface or molest the property of another.

*Id.* at 308–09, 500 A.2d 341.

### b. The Rule of Lenity

The required evidence test is the threshold standard for determining when two offenses merge, but, in addition,

> we have applied as a principle of statutory construction the "rule of lenity," which "provides that doubt or ambiguity as to whether the legislature intended that there be multiple punishments for the same act or transaction" will be resolved against turning a single transaction into multiple offenses.

*Williams*, 323 Md. at 321, 593 A.2d 671 (citations omitted). The rule of lenity applies where the required evidence test " 'might not be adequate to afford the protection against undue harassment embodied in the purpose of the prohibition against double jeopardy.' " *Brooks v. State*, 284 Md. 416, 423, 397 A.2d 596 (1979) (quoting *Cousins v. State*, 277 Md. 383, 397, 354 A.2d 825 (1976)). "[I]f we are unsure of the legislative intent in punishing offenses as a single merged crime or as distinct offenses, we, in effect, give the defendant the benefit of the doubt and hold that the crimes do merge." *Monoker v. State*, 321 Md. 214, 222, 582 A.2d 525 (1990). The relevant inquiry when applying the rule of lenity is "whether the two offenses are 'of necessity closely intertwined' or

whether one offense is *'necessarily* the overt act' of the other."
*Pineta v. State,* 98 Md.App. 614, 620–21, 634 A.2d 982 (1993)
(quoting *Dillsworth v. State,* 308 Md. 354, 366–67, 519 A.2d
1269 (1987)) (emphasis in *Pineta* ). "As it is a principle of
statutory construction, the rule of lenity applies where both
offenses are statutory in nature or where one offense is
statutory and the other is a derivative of common law."
*Khalifa v. State,* 382 Md. 400, 434, 855 A.2d 1175 (2004).[24]

The original fourth degree burglary statute was enacted by
the General Assembly through Chapter 661 of the Laws of
1973.[25] In *Herd v. State,* 125 Md.App. 77, 87, 724 A.2d 693
(1999), we discussed the legislative history of fourth degree
burglary, noting:

---

**24.** Fourth degree burglary, codified at Maryland Code (2002) § 6–205
of the Criminal Law Article ("C.L."), is a statutory offense that em-
braces four sub-varieties of criminal behavior. *Dabney v. State,* 159
Md.App. 225, 235, 858 A.2d 1084 (2004). C.L. § 6–205 provides:
> (a) Prohibited—Breaking and entering dwelling.—A person may not
> break and enter the dwelling of another.
> (b) Same—Breaking and entering storehouse.—A person may not
> break and enter the storehouse of another.
> (c) Same—Being in or on dwelling, storehouse, or environs.—A per-
> son, with the intent to commit theft, may not be in or on:
>> (1) the dwelling or storehouse of another; or
>> (2) a yard, garden, or other area belonging to the dwelling or
>> storehouse of another.
> (d) Same—Possession of burglar's tool.—A person may not possess a
> burglar's tool with the intent to use or allow the use of the burglar's
> tool in the commission of a violation of this subtitle.
Subsection (a) and (b), are general intent crimes, and, as such, are
"recent statutory inventions, whereas [subsection (c) and (d)] were
already venerable at the time of Blackstone and Hale." *Dabney,* 159
Md.App. at 235, 858 A.2d 1084. Appellant was charged pursuant to
C.L. § 6–205(a) and (b), and it is these subsections that we refer to in
our discussion. Malicious destruction of property is a common law
offense that has been codified "so that for many purposes it is treated
as two separate crimes based upon the value of the property de-
stroyed." *Spratt v. State,* 315 Md. 680, 681, 556 A.2d 667 (1989).

**25.** At that time, the statute read: "Any person who breaks and enters
the dwelling house of another is guilty of a misdemeanor and, upon
conviction thereof, shall be sentenced to imprisonment for a term of not
more than three (3) years or a fine of not more than five hundred
dollars ($500.00) or both." It is now codified at C.L. § 6–205(a).

The motivation for the new 1973 statute was the desire of the State's Attorneys of Maryland to have a lesser crime they could tactically fall back on in instances where they could readily prove the *actus reus* of breaking and entering but encountered difficulties of proof when it came to the *mens rea* of a particular specific intent.

 Judge Bloom explained in *Bane v. State*, 73 Md.App. 135, 148–49, 533 A.2d 309 (1987),

In 1973, the Maryland Senate Judicial Proceedings Committee received testimony from the State's Attorneys of various counties and Baltimore City that there was a need for a burglary offense of less severity than common law burglary or any of the then applicable statutory burglary-type crimes. The existence of such an offense, it was argued, would facilitate prosecutors in the handling of cases in which the felonious intent, a required element of common law burglary and all of the then statutory burglary offenses, of the intruder could not be clearly shown. Senate Bill 218 was drafted and submitted to the 1973 General Session with the intent of creating a criminal offense to comply with the State's Attorneys' wishes.

Furthermore,

The gravamen of the offense is the breaking and entering of the dwelling of another. To be convicted of statutory breaking and entering, as is evident from the legislative intent of the bill, no intent to commit a felony or to steal personal property need be shown. The misdemeanor crime of statutory breaking and entering, therefore, is a nebulous one as it relates to the intent of the perpetrator, since no showing of any particular intent is required ... All that must be shown is that the perpetrator broke and entered a dwelling place of another.

*Id.* at 149–50, 533 A.2d 309 (internal citations omitted). It is apparent that the General Assembly enacted fourth degree burglary to punish the *actus reus* of "breaking and entering the dwelling house of another" without regard to *mens rea,*

save that the violator must know the invasion is unauthorized. *Dabney,* 159 Md.App. at 237, 858 A.2d 1084.

 Malicious destruction of property, however, at common law and as codified by the General Assembly, is a specific intent crime, which "requires both a deliberate intention to injure the property of another and malice." *Shell v. State,* 307 Md. 46, 68, 512 A.2d 358 (1986). "In other words, it is not sufficient that the defendant merely intended to do the act which led to the damage to property; it is necessary that the defendant actually intended to cause the harm to the property of another." *In re Taka C.,* 331 Md. 80, 84, 626 A.2d 366 (1993). Malicious destruction of property for damage less than $500, the crime that appellant was charged with three times, carries a punishment of "imprisonment not exceeding 60 days or a fine not exceeding $500 or both." C.L. § 6-301.

 We do not find any ambiguity or other indication that the General Assembly did not intend separate punishments for fourth degree burglary and malicious destruction of property. Accordingly, the two offenses do not necessarily merge under the rule of lenity.

Nevertheless, "[o]ne of the most basic considerations in all our decisions is the principle of fundamental fairness in meting out punishment for a crime." *Monoker,* 321 Md. at 223, 582 A.2d 525 (reasoning that, "because the solicitation was part and parcel of the ultimate conspiracy and thereby an integral component of it, it would be fundamentally unfair . . . for us to require [appellant] to suffer twice"). We disagree with the State's assertion that the principles of fundamental fairness are inapplicable to the present case because both offenses are statutory. Rather, the concept of "fairness" permeates all of our decisions regardless of whether the offenses arise from common law or are purely statutory. *Williams v. State,* 323 Md. at 324, 593 A.2d 671; *Claggett v. State,* 108 Md.App. 32, 53-54, 670 A.2d 1002 (1996).

 Under the facts of the present case, the malicious destruction of property was clearly incidental to the breaking and entering of 13 and 17 Bay Street. Thus, we are persuad-

ed that Count 13, malicious destruction of property at 17 Bay Street, should have been merged into Count 12, the burglary conviction at that address; and that Count 17, the malicious destruction of property at 13 Bay Street, should have been merged into Count 16, the burglary conviction at that address.[26]

SENTENCES FOR MALICIOUS DESTRUCTION OF PROPERTY VACATED; JUDGMENTS AFFIRMED IN ALL OTHER RESPECTS. CASE REMANDED TO THE CIRCUIT COURT FOR TALBOT COUNTY FOR RESENTENCING.

COSTS TO BE PAID THREE–FOURTHS BY APPELLANT AND ONE–FOURTH BY TALBOT COUNTY.

---

**26.** The circuit court merged Count 18, the malicious destruction of property of the inside door at 13 Bay Street, into Count 16, the burglary conviction at that address. We do not perceive any difference in the malicious destruction of the inside door versus the outside door that occurred at that address. Therefore, we do not disturb that sentence.